IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JANE KIDD, ANDREA SUAREZ, | ) | |
| DR. MURRAY BLUM, | ) | |
| AND ANN BLUM, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | FILE NO. 1:06-CV-0997 |
| | ) | |
| CATHY COX, individually and in | ) | |
| her official capacities as Secretary of State | ) | |
| of Georgia and Chair of the Georgia | ) | |
| Elections Board, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Jane Kidd, Andrea Suarez, Dr. Murray Blum, and Ann Blum are each registered voters in Athens-Clarke County who are being discriminated against by SB 386, which was adopted by straight party-line vote of the Republican-dominated Georgia Legislature.  SB 386 dismembers Athens-Clarke County and divides it among two Republican-dominated Senate Districts. Plaintiffs have moved for a preliminary injunction pursuant to Fed.R.Civ.P. 65 enjoining the enforcement of the 2006 amendment to O.C.G.A. § 28-2-2 to the

extent that it reapportions State Senate Districts 46, 47 and 49 ("SB 386").  In adopting SB 386 the State of Georgia has violated the same principles that led this Court to declare Georgia's previous State Senate District plan unconstitutional. *See, Larios v. Cox,* 300 F. Supp. 2d 1320, 1351 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004) ("the Supreme Court has never sanctioned partisan advantage as a legitimate justification for population deviations").

Through its redrawing of three Georgia Senate Districts SB 386:

(1)     discriminates against voters residing within proposed Senate District 47 by creating Senate Districts that are not as nearly equal in population as practicable, in violation of the equal protection clauses of the Fourteenth Amendment to the United States Constitution, Article I § 1 ¶ 2 of the Georgia Constitution, 42 U.S.C. §§ 1983 and 1988;

(2)     has the purpose and effect of unlawfully burdening the associational and representational rights of Democratic voters residing in Clarke County based on their political viewpoints, as reflected by their past voting behavior and patterns, in violation of the First and Fourteenth Amendments to the United States

Constitution, Article I § 1 ¶¶ 5 and 9 of the Georgia Constitution,

42 U.S.C. §§ 1983 and 1988; and

(3)      violates Article III § 2 ¶ 2 of the Georgia Constitution, which

provides that the apportionment of the Legislature shall be

changed only "*as necessary* after each United States decennial

census" (emphasis added).

SB 386 has a discriminating impact on plaintiffs' rights as citizens to vote,

which is a fundamental right protected by the Constitution.

> [W]e conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic Constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon facts such as race, . . . or economic status.

*Reynolds v. Sims*, 377 U.S. 533, 565-66 (1964) (internal citations omitted).

*Accord*, *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("[o]ther rights, even the most

basic, are illusory if the right to vote is undermined").

In *Larios v. Cox*, the Court affirmed that "a denial of constitutionally

protected rights demands judicial protection. . ." *Larios v. Cox,* 300 F. Supp. 2d at

1339 (*quoting Reynolds*, 377 U.S. at 566). In that Order the Court expressly stated

that it will not ignore that duty and enjoined an unconstitutional redistricting plan.

300 F. Supp. 2d at 1339.  Such vigilance in preventing unconstitutional infringements on the right to vote is appropriate.  *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984) (Because of the preferred place it occupies in our constitutional scheme, "any illegal impediment to the right to vote, as guaranteed by the U.S. Constitution or statute, would by its nature be an irreparable injury."); *accord, Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) ("denial of the right to vote" constitutes irreparable injury); *Foster v. Kusper*, 587 F. Supp. 1191, 1193 (N.D. Ill. 1984) (denial of the right to vote for candidate of choice constitutes "irreparable harm"); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the loss of constitutionally protected freedoms "for even minimal periods of time, unquestionably constitutes irreparable injury").  Accordingly, the plaintiffs seek a preliminary injunction to prevent irreparable harm to their fundamental voting rights.

## STATEMENT OF FACTS

**I.    The *Larios* Court Struck Down The 2002 Senate District Plan And Created An Interim Plan**

On February 10, 2004, the *Larios* Court enjoined the use of reapportionment plans for Georgia's House and Senate adopted by the Democratically-controlled Georgia Legislature, because these plans were not "as nearly equal in population as practicable," and therefore violated the one person, one vote principle guaranteed

by the equal protection clause of the United States Constitution.  *See Larios,* 300 F. Supp. 2d at 1357-58.  In its Order, the Court gave the General Assembly the opportunity to adopt a new reapportionment plan, but the General Assembly failed to do so.

The *Larios* Court then appointed a Special Master to create legislative apportionment plans for the State of Georgia, giving the Special Master explicit instructions to ensure that the legislative districts created by the Special Master would adhere to the strictures of the Constitution and other governing law.

The Special Master created the plans and, after hearing argument from numerous interested parties regarding the specifics of the plan, on March 24, 2004, the *Larios* Court entered an order adopting an amended version of the Special Master's plan (the "Court Plan") that reapportioned both the State House and the State Senate Districts in Georgia.  In so doing, the Court ruled that the districts were as nearly equal in population as was practicable, as required by *Reynolds v. Sims*, and adhered to all other relevant Constitutional and legal requirements.  A copy of the district map associated with the Court Plan is attached hereto as Exhibit A.

There were no appeals or challenges to the Court Plan, which governed the 2004 elections for the Georgia Senate.  The *Larios* Court specifically retained

jurisdiction in its Order issued April 30, 2004, stating "[t]he clerk may enter final judgment.  However, ***the court will retain jurisdiction of this action*** for such other and further orders as may be necessary."

## II.    The Republican Incumbent For Senate District 46 Announced That He Will Not Seek Re-Election, And Plaintiff Jane Kidd Announced That She Will Seek To Represent District 46 In The Georgia Senate.

After the 2004 election, Brian Kemp, the current Republican incumbent in District 46, informed the Republican leadership in the General Assembly that he did not intend to seek re-election in District 46, but instead would run in the statewide election for Agriculture Commissioner.[1]

After Kemp's announcement, Democratic State Representative Jane Kidd announced her candidacy for Senate District 46 on May 20, 2005.  Several months later, on October 3, 2005, Kemp's brother-in-law, Bill Cowsert, announced that he intended to seek the Republican nomination for the seat being vacated by Kemp in District 46 despite the fact that Jane Kidd defeated Cowsert in a head-to-head election in 2004 for House District 115, with Kidd receiving 56% of the vote.[2]

---

[1]     *See* Declaration of Jane Kidd, dated April 26, 2006 ("Kidd Decl."), ¶ 5.

[2]     Kidd Decl., ¶¶ 7 & 8.

### III.   In Its 2006 Session, The General Assembly Enacted SB 386 Which Redrew Three Senate Districts, 46, 47, and 49.

On the first day of the 2006 legislative session, Republican Senator Ralph Hudgens introduced SB 386 in the Senate Reapportionment Committee, proposing that 3 of the 54 state Senate Districts be redrawn.[3]   Senator Hudgens suggested that the purpose of the bill was to include all of Madison County in one Senate District.[4]

SB 386 drastically alters Senate Districts 46 and 47 by (1) splitting Athens-Clarke County (geographically, the smallest county in Georgia, which had previously been entirely within District 46 and which had never been divided), between two districts, Districts 46 and 47, (2) moving a precinct in Madison County from the 46th to the 47th District, (3) moving all of Oglethorpe County from the 46th to the 47th, and (4) moving the portions of Walton County that had been in District 47 into District 46.[5]

---

[3]     Declaration of Robert Brown, dated April 25, 2006 ("Brown Decl."), ¶¶ 4 & 5.

[4]     *See* Transcript of Meeting of Senate Reapportionment Committee (hereinafter "Senate Reapportionment Tr."), pp. 7-8.  A copy of this transcript is included in Exhibit B hereto; *see also* Brown Decl., ¶ 6.

[5]     Brown Decl., ¶ 5.  A copy of the SB 386 Senate district map is attached as Exhibit C.

SB 386, created new Senate Districts 46, 47 and 49 that are less equal in population than the existing Senate Districts 46, 47 and 49 under the Court Plan. As reflected in the table below, the redistricting performed by SB 386 increases the absolute deviation by 728 people:

|  | **Court Plan** | **SB 386** |
|---|---|---|
| "Absolute Deviation" between most and least populous of the three districts | 1,653 persons[6] | 2,381 persons[7] |
| Deviation as a percentage of the ideal district[8] | 1.13%. | 1.63% |

---

[6]    Under the Court's Plan for State Senate Districts 46, 47, and 49, the total populations, as reflected in the 2000 census, were as follows:  (a) District 46—145,476 persons; (b) District 47—147,129 persons; and (c) District 49—146,916 persons.  Kidd Decl., Exh. 2; State of Georgia's Submission Under Section 5 of the Voting Rights Act (attached hereto as Exhibit B), Exh. B-3.

[7]    SB 386 creates districts that are less equal in population than Senate Districts 46, 47 and 48 as drawn by the Court.  Specifically, the populations of the three districts under SB 396 are as follows: (a) District 46—145,476; (b) District 47 147,129; (c) District 49–146,916.  State of Georgia's Submission Under Section 5 of the Voting Rights Act (attached hereto as Exhibit B), Exh. B-4.

[8]    Based upon the 2000 Census, Georgia's population was 8,186,453 persons.  Because there are 56 Senate seats, the ideal population for each Senate District in Georgia is 146,187 people (*i.e.* the total population divided by the number of Senate Districts).  State of Georgia's Submission Under Section 5 of the Voting Rights Act (attached hereto as Exhibit B), Exh. B-3, p. 3.

**IV.   SB 386 Passed Strictly Along Party Lines With A Minimum Of Debate Or Opportunity For Public Input.**

SB 386 was kept secret until the day it was introduced in committee.  There was not a single public meeting in any of the areas affected, nor did the sponsors of the bill notify the Mayor of Athens Clarke-County, the Athens-Clarke County Commission, or either of the State Representatives elected from Athens-Clarke County.[9]

While Senator Ralph Hudgens, the bill's sponsor and the incumbent in District 47, represented in the Senate Reapportionment Committee that the change had been requested by the Madison County Commission, SB 386 was never submitted to the current Madison County Commission for its endorsement or approval.  As one Madison County Commissioner stated "It possibly may have

---

[9]    Kidd Decl., ¶¶ 14-16; Senate Reapportionment Tr., pp. 12-13.  Once they discovered the existence of the bill, both State Representatives from Athens-Clarke County, Keith Heard and Jane Kidd, vehemently opposed the bill.  Also, On January 23, 2006, after the bill had passed the Senate, the Mayor of Athens-Clarke County, the County's elected Tax Commissioner, and a majority of the Athens-Clarke County Commission, wrote a joint letter to Governor Perdue registering their "strong opposition" to the bill and asking that the letter be considered "an official protest and condemnation of both the bill itself and the lack of openness and candor demonstrated by those involved" in its creation.  And on January 25, 2006, the Athens Clarke-County Commission adopted a Resolution condemning SB 386 and noting that "the citizens of Athens-Clarke County were not consulted, informed or notified" that any plan to redistrict was going to be considered, and that the bill was proposed "without the benefit of any local discussion, input or consideration."  Kidd Decl., ¶¶ 14-16.

been brought up and discussed at one of the Republican party meetings . . . [but] we have never signed off on anything."[10]

In the Republican-dominated Legislature, not only was SB 386 introduced without consultation with any Democrat elected to represent the areas affected, and passed without the support of a single Democrat from the area, but from beginning to end, the process of the bill's passage was wholly partisan.[11]

On the very first day of the Legislative session, the Republican-dominated Senate Reapportionment Committee held a 20-minute hearing on the proposal and pushed it through the committee with a "Do Pass" (rather than a neutral) recommendation.[12]  The vote was strictly on party lines, with every Republican supporting it and every Democrat voting to stop it.[13]  The bill passed the Republican-dominated Senate based upon a straight party-line vote of 34 to 22.

---

[10]    Blake Aued "Informed? No, say an ex- and current commissioner," *Athens Banner-Herald*, March 2, 2006; *see also* Blake Aued, "No new remap bid by county: redistricting not included in current leaders' wish list", *Athens Banner-Herald*, Jan. 27, 2006.

[11]    *See* Declaration of Representative Barbara Reece dated April 24, 2006 ("Reece Decl."), ¶¶ 17 & 17; Brown Decl., ¶¶ 9-10.

[12]    *See* Senate Reapportionment Tr., pp. 16-17.

[13]    Brown Decl., ¶ 9.

Every Republican in the State Senate voted in favor of SB 386, and each of the 22

Democratic Senators voted against the bill.[14]

When the bill went to the Georgia House of Representatives, the Republican

controlled House Reapportionment Committee again passed the bill through

committee based on a straight party line vote.[15]  The bill then was passed in the

House of Representatives, without a single dissenting Republican vote, and with

the votes of only 4 of the 79 Democrats.[16]

All told, SB 386 was passed through two committees and the full

membership of both the Senate and the House of the State Legislature without a

single dissenting vote by a Republican.

The proposed reapportionment of Senate Districts 46, 47 and 49 by SB 386

was not necessary because a constitutional state-wide plan had been adopted and

approved by this Court only two years earlier.  Further, such a mid-decade

alteration of three districts was an unprecedented departure from past practice.

Nevertheless, SB 386 was signed into law by the Republican Governor, Sonny

---

[14]    *Id.*

[15]    Reece Decl., ¶ 16.

[16]    Reece Decl., ¶ 17.

Perdue, on February 28, 2006, and preclearance was granted by the U.S.

Department of Justice on April 20, 2006.

SB 386 is the **fourth** Senate plan governing these districts since 2000.  If SB

386 governs the 2006 election, voters in the affected area of the state will have

voted under a different Senate plan in each and every one of the four elections held

this decade.

## V.    The Republican-Dominated House Reapportionment Committee Rejected An Alternative "Fair Madison Plan."

Representative Barbara Massey Reese, a Democratic Representative from

Chattooga County who serves on the House Reapportionment Committee,

introduced an alternative bill (the "FairMadison Plan"), which would have

achieved the purported purpose of SB 386 by ensuring that not only Madison

County, but Clarke County, as well, would not be split between Senate districts,

while at the same time drawing districts that were more nearly equal in population

than those created by SB 386.[17]

The FairMadison Plan (a) unified Madison County in a single district,

(b) maintained a unified Clarke County, (c) created districts that were more nearly

equal in population than in SB 386, (d) involved a change of Senate districts for

---

[17]    Reece Decl., ¶¶ 5-6.

only 4 precincts (in contrast to the 29.5 precincts shuffled by SB 386), (e) avoided further splitting of precincts, ***and*** (f) without discriminating against voters in Clarke or Madison Counties based on their party affiliation or political viewpoints, as reflected by their historic voting patterns, maintained the competitive nature of Senate District 46.[18]

The FairMadison Plan was rejected in the House Reapportionment Committee by a straight party line vote, and SB 386 was then approved by the committee on the same party line.[19]

## ARGUMENT

Preliminary injunctive relief should be granted in this case because the plaintiffs have demonstrated: (1) a substantial likelihood of prevailing on the merits of at least one of their claims; (2) that the plaintiffs and other voters in the affected districts will suffer irreparable harm to their rights unless injunctive relief is granted; (3) that the threatened injury to the rights of the plaintiffs and other Georgia voters outweighs whatever damage the proposed injunction may cause the opposing party (which is none); and (4) the grant of an injunction would not adversely affect the public interest. *Warren Publ'g, Inc. v. Microdos Data Corp.*,

---

[18]    Reece Decl., ¶¶ 6-8.

[19]    Reece Decl., ¶¶ 13, 15.

115 F.3d 1509, 1516 (11th Cir. 1997); *United States v. Jefferson County*, 720 F.2d

1511, 1519 (11th Cir. 1983).

**I.    The Plaintiffs Are Likely To Succeed On The Merits On Their Claims For Relief In This Action.**

> **A.    SB 386 Violates the One Person, One Vote Principle Guaranteed Under the Equal Protection Clause of the Fourteenth Amendment.**

When devising a redistricting plan, each state is required to make an "honest

and good faith effort" to construct districts "as nearly of equal population as is

practicable." *Larios,* 300 F. Supp. 2d at 1339, citing *Reynolds v. Sims,* 377 U.S. at

577.  While some deviations from the equal population principle are

constitutionally permissible for seats in the state legislature, such variations must

be based only on certain factors that are free from any taint of arbitrariness or

discrimination. *See Larios,* 300 F. Supp. 2d at 1340.  Further, the court must

consider "the consistency of application and the neutrality of effect of the

nonpopulation criteria" in order to determine whether a state legislative

reapportionment plan violates the Fourteenth Amendment. *Id.*

In adopting SB 386, the Republican-dominated General Assembly made no

effort to create districts as nearly equal in population as were practicable.  Instead,

the Republican majority willfully and deliberately chose to create Senate Districts

that were less equal in population than either:  (1) the existing districts established

by the Court Plan already in place, or (2) the alternative FairMadison reapportionment bill that was introduced in the House Committee on Reapportionment.  Furthermore, SB 386 finds no constitutional support for its population deviations in its sponsor's proffered justifications, application of any traditional redistricting principles, or the bill's apparent purpose, which was partisan gain for the Republican party.  Such a law, with unjustified population deviations, violates the principle of "one-person-one-vote," and therefore the equal protection clauses of both the United States and Georgia Constitutions.

### 1.     The legislature failed to make an honest effort to create districts as nearly equal in population as practicable

The *Larios* Court held that the "Constitution of the United States requires that . . . state legislative seats be apportioned equally, so as to ensure that the constitutionally guaranteed right of suffrage is not denied by debasement or dilution of the weight of a citizen's vote."  300 F. Supp. 2d at 1337 (*citing Reynolds v. Sims*, 377 U.S. at 555, 568; *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964)).  The *Larios* Court also held that the Constitution provides that, in state legislative reapportionment, "the invariable objective . . . remains 'equal representation for equal numbers of people.'"  *Id.* at 1337 (*quoting Wesberry v. Sanders*, 376 U.S at 18).

Despite the clarity of the *Larios* Court's articulation of the foregoing principles, the Georgia General Assembly failed to abide by them. The General Assembly was faced with three options – the Court Plan already in existence, the FairMadison amendment introduced in the House Reapportionment Committee, and SB 386.[20] The General Assembly, with all of the facts at hand, deliberately chose the least equal of the three. Such a decision is not an honest attempt to create districts as nearly equal in population as practicable.

SB 386, created new Senate Districts 46, 47 and 49 that are less equal in population than the existing Senate Districts 46, 47 and 49 under the Court Plan. As reflected on the table above, the redistricting performed by SB 386 ***increases*** the absolute deviation by 728 people.

During deliberations, and before voting on the Bill, this information was provided to Legislators along with copies of the Bill.[21] Furthermore, as the *Larios* Court has recognized, the technology used by the state of Georgia would allow the Legislature to draw redistricting plans "with a deviation of 0 to 1 persons," and makes "perfect equality" among districts "certainly attainable." *Larios*, 300 F. Supp. 2d at 1320 & 1341. Thus, it would undeniably have been possible for the

---

[20]    *See* Reece Decl., ¶¶4, 13, 16, 17.

[21]    Kidd Decl., ¶ 24.

Legislature to create a map with a smaller deviation, and the Legislature simply chose not to do so.

Further, the Republican-dominated House Committee on Reapportionment was give the opportunity to adopt the FairMadison plan that met all of the purported (but pretextual) goals of SB 386 and yet still created districts that were more nearly equal in population than those created by SB 386, but the Republicans on the committee rejected the amendment by a party-line vote.[22]  Under the FairMadison plan, as it was introduced in the House Reapportionment Committee, the "absolute overall range" would have been 1,715 people instead of 2,381 (as under SB 386), and the total percentage deviation from the ideal would have been reduced from 1.63% to 1.17%.[23]

Despite the fact that this alternative plan would have kept both Clarke and Madison Counties whole, and would have created districts that are more equal, the Republicans on the House Reapportionment Committee rejected the FairMadison proposal by a strict party line vote.[24]

---

[22]    Reece Decl., ¶¶ 5-7, 13, 16.

[23]    Reece Decl., ¶ 7.

[24]    Reece Decl., ¶¶ 13, 16.

The fact that the Republican General Assembly chose the **least** equal (or most discriminatory) of all the options at hand, is convincing evidence that they were not attempting to create districts "as nearly equal as practicable in population" as required by *Reynolds v. Sims* and *Larios*.

Moreover, the drafters of SB 386 were under the same misconception as the drafters of the Democratic plans that were struck down in *Larios*. They believed that there was a "safe harbor" below which arbitrary population deviations were apparently permissible. Specifically, the discussion in both the Senate Committee and the House Committee included references to a "one percent" guideline.[25] Indeed, Senator Hudgens, the bill's sponsor, justified splitting a precinct in Clarke County on the ground that the split was necessary "in order to get us under the 1% guideline."[26]

In adopting SB 386, the Republican majority thus mimicked the unconstitutional conduct described in *Larios*. There, as here, the plan's drafters used a percentage guideline as a safe harbor (albeit with a much larger deviation), rather than trying to create districts as equal in population as possible; this safe harbor assumption amounted to "conceding the absence of an 'honest and good

---

[25]    *See* Senate Reapportionment Tr., pp. 6, 11.

[26]    *Id.*, p. 11.

faith effort' to construct equal districts." *Larios,* 300 F. Supp. 2d at 1352. Further, there, as here, "the creators of the plans had the technical capability to create maps with substantially smaller population deviations than the plans that were eventually passed, [and] legislators were actually presented with a number of proposed maps with smaller deviations and systematically rejected them." *Id.*

Based upon the FairMadison plan and the Court's plan, in this case, just as in *Larios,* "[i]t is readily apparent that alternative plans could have been easily constructed that did not stretch the limits of the one person, one vote principle so far, all the while achieving the state's legitimate interests." *Id.* Thus, just as in *Larios,* "the plaintiffs have shown that the state legislative reapportionment plans enacted by the Georgia Legislature do not represent an honest and good faith effort to construct districts as nearly of equal population as is practicable." *Id.* (*quoting Reynolds,* 377 U.S. at 577).

### 2. The population deviations in SB 386 are not supported by the neutral and consistent application of any traditional redistricting principles.

The *Larios* Court held that any reapportionment plan that contains population deviations that "are not supported by . . . legitimate interests but, rather, are tainted by arbitrariness or discrimination, [the deviations] cannot withstand constitutional scrutiny." *Larios,* 300 F. Supp. 2d at 1338 (*citing Roman v. Sincock,*

377 U.S. 695, 710 (1964)).  Put another way, as the court in *Reynolds* stated, a

reapportionment plan may only contain "divergences from a strict population

standard [that] are based on legitimate considerations incident to the effectuation of

a rational state policy."  *Reynolds*, 377 U.S. at 577.

In this case, the population deviations fail these tests because they are not

supported by ***any*** legitimate interests and are tainted by discrimination.  SB 386,

therefore, cannot withstand constitutional scrutiny.

First, it is undeniable that there is no constitutional or legal ***need*** for new

districts at all.  SB 386 replaces a Senate District plan that was created by a Special

Master based on non-partisan, neutral principles of redistricting that was

unanimously approved by the *Larios* Court.  No party has alleged that the districts

created by the Court Plan were or are unconstitutional.  Thus, SB 386 does not

address any of the state interests inherent in replacing an invalid, or

malapportioned set of districts.  It follows, therefore, that SB 386 must be

scrutinized more closely than reapportionments replacing malapportioned and

unconstitutional plans because there are no state interests inherent in changing a

constitutional and valid apportionment scheme.

Second, the differences in the populations of the three districts created by SB

386 were not necessary to achieve any of the legitimate state interests that were

identified in *Larios*, "such as making districts compact and contiguous, respecting political subdivisions, maintaining the cores of prior districts, and avoiding incumbent pairings." 300 F. Supp. 2d at 1337 (*citing Karcher v. Daggett,* 462 U.S. 725, 740-41 (1983)).

The *Larios* Court found that Georgia, in particular, has a "strong historical preference … for not splitting counties outside the Atlanta Area, and not splitting precincts, maintenance of core districts, and recognition of communities of interest." 300 F. Supp. 2d at 1349 (*quoting Abrams v. Johnson*, 521 U.S. 74, 99-100 (1997)).

Simply put, the population deviations created by SB 386 were not intended to and do not remedy any of the legitimate interests identified by this Court in *Larios*, or any other court dealing with legislative reapportionment.

There can be no claim that the population deviations in SB 386 were necessary to remedy any lack of compactness, or lack of contiguity in Senate Districts. In addition, SB 386 was not intended to and does not remedy any "pairing of incumbents," as no incumbent is seeking reelection in District 46 or 49, and no other incumbent is "paired."

Moreover, SB 386 does not further, but violates, the legitimate interest in preserving "political subdivisions" and Georgia's "strong historical preference" for

not splitting counties outside the Atlanta Area.  SB 386 splits Clarke County

between two districts for the first time in the County's history.

SB 386 does not further, but violates, the legitimate state interest in

"preserving the cores of prior districts" and Georgia's "strong historical

preference" for maintaining "core" Senate Districts.  SB 386 splits the municipality

of Athens-Clarke County, which is by far the largest metropolitan area in Senate

Districts 46 and 47, and has been the core business and population center for

generations and has **always** been encompassed within a single Senate District.

SB 386 does not further, but violates, this State's "strong historical

preference" for not splitting precincts.  SB 386 splits an additional precinct that

was not split under the Federal Court Plan, and would not be split under the

"FairMadison" amendment.[27]

SB 386 does not further, but violates, this State's "strong historical

preference" for recognizing communities of interest.  The line drawn by SB 386

divides members of numerous communities of interest one from the other.

Examples include: (a) the dividing line runs through the University of Georgia

campus and divides University of Georgia facilities among Senate Districts, (b) the

line splits Clarke County without regard to the Clarke County Commission

---

[27]    *See* Reece Decl., ¶ 11; Senate Reapportionment Tr., p. 11.

districts, which means that people who are represented by the same County

commissioners, will be represented by different State Senators, (c) the line was

drawn without regard to Clarke County school districts, and even splits the major

attendance districts used to determine which of Athens's two high schools a child

will attend, (d) the line severs all of the students and professors at the University of

Georgia who live in the eastern half of Clarke County from the rest of the campus,

and the students and professors who live in the rest of Clarke and Oconee

Counties, making it difficult to address important issues affecting the State's

flagship university, and (e) the line divides two state House Districts: Districts 115

and 114 were both included in the same Senate District prior to SB 386, now each

of them will be split among two.[28]

### 3. *Even the purported justifications offered by the bill's supporters fail constitutional scrutiny.*

The population deviations in SB 386 are not supported by any of the

purported justifications offered by the bill's sponsors or supporters. According to

the bill's sponsor, the stated purpose of SB 386 was to place Madison County

wholly within a single Senate District.[29] However, in order to comply with the

Constitution, any reasons for placing Madison County within a single district must

---

[28]     *See* Kidd Decl., ¶¶ 17-18.

[29]     Brown Decl., ¶ 6; Senate Reapportionment Tr., pp. 5-8.

be made equally applicable to Clarke County. *See, e.g. Larios*, 300 F. Supp. 2d at 1340 ("In considering legitimate justifications, courts must consider 'the consistency of application and the neutrality of effect of the nonpopulation criteria'") (*quoting Brown v. Thomson*, 462 U.S. 835, 845-46 (1983)). Yet SB 386 splits Clarke County, applying the principle of "preserving county integrity" in an arbitrary and inconsistent way.

In fact, the sponsor of the bill admitted that the goal of SB 386 was to keep "smaller" counties whole, and that there was a preference for splitting "larger counties."[30] This is precisely the type of inconsistency that the *Larios* Court rejected, *see Larios*, 300 F. Supp. 2d at 1342-47 (discussing unconstitutionality of regional favoritism, and stating that "[d]iscrimination against certain voters based on the fortuity of where in the state they live cannot be reconciled" with the Constitution), and that the Supreme Court has long held does not justify population deviations. *See, e.g., Brown v. Thomson*, 462 U.S. 835, 845-46 (1983) (non-population criteria must be neutrally and consistently applied) .

Further, and in any event, the desire to unify Madison County cannot justify the population deviations in SB 386 because the FairMadison plan proves that the unification of Madison County did not require the population deviations created by

---

[30]    Senate Reapportionment Tr., p. 12; Brown Decl, ¶ 6.

SB 386.  The FairMadison plan would have united all of Madison County within the same Senate District, and it would also have allowed Athens-Clarke County to remain intact within a single Senate district.[31]  Thus, the FairMadison plan would have served the interest of county integrity more fully.  And, as discussed above, the FairMadison plan created districts that were more equal in population than the districts created by SB 386.[32]  That this FairMadison plan was summarily rejected along party lines in favor of SB 386 shows that (1) the "county integrity" justification was pretextual and applied in an inconsistent and discriminatory way; and (2) that "county integrity" could not in any event justify the population deviations because the goal could be achieved without the larger deviations in SB 386.

The FairMadison plan also belies any argument that SB 386 seeks to avoid voter confusion.  As the Court in *Larios* noted, part and parcel of the argument for respecting political subdivisions is the possibility of reducing voter confusion and mistakes on election day.  *Larios*, 300 F. Supp. 2d at 1346.  Thus, by splitting Clarke County, SB 386 increased the possibility of voter confusion.  *Id.* (noting that preserving county lines reduces voter confusion).  Additionally, when

---

[31]     Reece Decl., ¶¶ 6-8, 10-12.

[32]     *See* Reece Decl., ¶ 7.

compared to the FairMadison plan, SB 386 would cause far more voter confusion because it transfers voters in 29 and-one-half precincts from one Senate District to an entirely new Senate District.[33]  The FairMadison plan, on the other hand, would have achieved all of the purported goals of SB 386 while changing the State Senate Districts for only four precincts (as opposed to 29.5), and leaving 97% of the voters in the same Senate District as the Federal Court plan.[34]

Finally, any interest in drawing district lines to unify a particular county (or to avoid voter confusion) is only legitimate for the purposes of withstanding constitutional scrutiny if the reapportionment plan does not "contain any built-in bias tending to favor particular political interests or geographic areas."  *Larios*, 300 F. Supp. 2d at 1346 (*quoting Abate v. Mundt*, 403 U.S. 182, 187 (1971) and *citing Brown*, 462 U.S. at 844).  As discussed below, SB 386 is also unconstitutional because it was specifically designed to favor certain political interests, and to disfavor Clarke County's traditionally Democratic voters.

---

[33]     *See* Reece Decl., ¶ 8.

[34]     *Id.*

  **4.**   ***The real purpose behind the redistricting contained in SB 386 does not justify the deviation from one person, one vote that it imposes.***

  The Legislature's rejection of the "FairMadison" alternative bill introduced in the House Reapportionment Committee demonstrates that the true purpose of SB 386 was not to unify Madison County, or to reduce voter confusion, but was rather to dilute the power of Democratic voters in Clarke County, and ensure Republican victory in Senate District 46.[35]

  As discussed above, Jane Kidd's announced candidacy for the 46th District and the fact that her apparent Republican opposition will be Bill Cowsert, whom

---

[35]   Reece Decl., ¶¶ 14-15.  Statements of the Sponsor and Supporters of SB 386 confirm this conclusion.  For example, Senator Hudgens, the current incumbent in District 47 and the Bill's sponsor, told the January 2006 meeting of the Madison County Republican Party that, "If you look at the people who are against this plan, they are against it ***because it's bad for the Democratic Party*** . . .", "Perdue signs Hudgens' redistricting plan," (March 8, 2006) *available at* http://www.mainstreetnews.com/2006/March/M0308E.html (emphasis added).  A copy is attached hereto as Exhibit D.

  As the *Oconee Enterprise* reported, Brian Kemp, the current Republican Senator in District 46 (who, under Senate rules was required to support the bill in order for it to be considered), admitted that splitting Clarke County would reduce its political power and increase the power of neighboring counties, including Oconee County.  Specifically, Kemp stated that "This bill keeps you (Oconee County) in the 46th district, but about 100,000-plus [sic] people would be in another district, so Oconee will have a stronger voice."  Billy Vaughn, "Redistricting plan give Oconee stronger voice," *Oconee Enterprise*, January 19, 2006, at A7.  A copy is attached hereto as Exhibit E.

Kidd defeated in a head-to-head race for the Georgia House in 2004, cast serious

doubt on the prospects for a Republican victory in Senate District 46.[36]  Under the

*Larios* plan, Senate District 46 was far more competitive between Democrats and

Republicans than neighboring Districts 47 and 49, which vote Republican

consistently and overwhelmingly.  Indeed, in the 2004 election, Senator Brian

Kemp, the Republican incumbent in District 46 received 51.6% of the vote.[37]  In

contrast, in elections to the Georgia Senate, the Republican in District 47 received

over 71%, and the Republican in District 49 ran unopposed and received 100% of

the vote.[38]  The reason for this competitiveness is that District 46 encompasses all

of Athens-Clarke County, and voters living in Athens Clarke-County tend to vote

for Democratic candidates more than voters in surrounding areas.[39]

---

[36]    *See* Kidd Decl., ¶¶ 4-8, 12.

[37]    *See* Kidd Decl., ¶¶ 20-24; *see also*
http://www.sos.state.ga.us/elections/election_results/2004_1102/senate.htm.

[38]    *See*
http://www.sos.state.ga.us/elections/election_results/2004_1102/senate.htm.

[39]    Kidd Decl., ¶¶ 21, 23.  For example, (a) in 2004 not a single Republican won
a County election in Clarke County, while 11 Democrats were elected to County
office; (b) in the 2004 Presidential race, while the State of Georgia, overall,
supported Republican Candidate George Bush over Democrat John Kerry by a
margin of 58% to 41%, Athens-Clarke County supported Kerry with 58% of the its
votes.  Clarke County election results, *available at*
http://www.athensclarkecounty.com/elections/results_g04.html; State of Georgia

The Republican leadership in the Legislature created a reapportionment scheme to split Clarke County and distribute voters residing in its traditionally Democratic-leaning precincts among the predominantly Republican Senate Districts surrounding Clarke County.[40]  In addition, the plan specifically divides House District 115, placing certain populous and Democratic-leaning sections of Representative Kidd's current district into the 47th Senate District, while Representative Kidd's residence would remain in the 46th.[41]  The objective, of course, was to remove as many Democratic voters (Kidd's political base) as possible from the 46th Senate District.  Particularly because those very neighborhoods and voters had already elected Kidd as their State Representative instead of the candidate favored by the Republicans, Senator Kemp's brother-in-law Bill Cowsert.

This goal of partisan political gain for the Republican party cannot justify the inequality of the Senate Districts created by SB 386 because, as the *Larios*

---

election results, *available at* http://www.sos.state.ga.us/elections/election_results/2004_1102/federal.htm Indeed, while Republican State Senator Brian Kemp received 51.6% of the total vote in Senate District 46, he lost to his Democratic opponent in Clarke County by almost 6,000 votes and received less than 42% of Clarke County's total.

[40]     *See* Kidd Decl., ¶ 22.

[41]     *Id.*

Court stated, ***"the Supreme Court has never sanctioned partisan advantage as a legitimate justification for population deviations."*** *Larios,* 300 F. Supp. 2d at 1351 (emphasis added).

Essentially, the General Assembly ignored the *Larios* Court's clear mandate for the creation of constitutional Senate Districts in Georgia, amended the Court's Plan, and in doing so, created districts that violate the same principles that the *Larios* Court outlined in its February 10, 2004 Order by failing to make "an honest and good faith effort" to construct districts as nearly equal as practicable and by failing to "contain only those divergences from a strict population standard that are based on legitimate considerations incident to the effectuation of a rational state policy." *Larios*, 300 F. Supp. 2d at 1353 (*quoting Reynolds*, 377 U.S. at 577.) SB 386 therefore violates the Equal Protection clauses of the United States and the Georgia Constitutions. *See* U.S. Const. Amend. XIV; Ga. Const. Art. 1, § 1, ¶ 2.

### B.   SB 386 Inflicts Viewpoint Discrimination in Violation of the Constitutional Guarantees of Freedom of Speech, Association and Petition

The purpose and effect of SB 386 is to discriminate against and penalize Jane Kidd and the other plaintiffs, and citizens and voters residing in Clarke County, based on their political viewpoints and beliefs, as these beliefs are reflected by their past voting history that has tended to favor Democrats over

Republicans, and their affiliation with the Democratic Party.[42]  Specifically, SB 386 burdens the representational rights of certain voters, including the plaintiffs, by moving them into an overpopulated Senate District because of the content of their past expression.  In addition, SB 386 makes it more difficult, if not impossible, for Democratic voters residing in Clarke County to elect someone to the State Senate who shares their political beliefs and opinions, or is a member of their political party.

Likewise, the purpose and effect of SB 386 is to discriminate ***in favor*** of those citizens and voters residing in Clarke County based on their political viewpoints, beliefs and political party affiliation, as reflected by their past voting history, that have tended to favor Republicans over Democrats by making it far more likely that they will be able to elect a Republican to the State Senate who shares their political beliefs and opinions, and is a member of the same political party as their own.

SB 386 thus runs afoul of the First Amendment to the United States Constitution.  As Justice Kennedy described in *Vieth v. Jubelirer*, 541 U.S. 267 (2004):

---

[42]      *See* Kidd Decl., ¶¶ 19, 21-24; Declaration of Andrea Suarez, dated April 26, 2006 ("Suarez Decl."), ¶ 5.

> [In the political gerrymandering context] [t]he First Amendment analysis concentrates on whether the legislation burdens the representational rights of the complaining party's voters for reasons of ideology, beliefs or political association. . . . *Id.* at 269.
> . . . .
>
> The inquiry is not whether political classifications were used. The inquiry instead is whether political classifications were used to burden a group's representational rights. If a court were to find that a state did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the state shows some compelling state interest.

*Id.* at 315 (J. Kennedy concurring).

This Court has recognized that, in Georgia, the

> combination of technology and political data available to legislators and [reapportionment] plan drafters also allowed for sophisticated analyses of political performance, so that maps could be drawn and then immediately analyzed politically. Thus in drafting and considering their proposed maps, members of both houses relied on political performance projections, indicating the percentage of votes Democrats and Republicans would likely receive in future elections based upon an assessment of past election results.

*Larios*, 300 F. Supp. 2d at 1324. Such political performance data was available to

and used by the Republican majority in the General Assembly in adopting SB

386.[43]

---

[43]    Kidd Decl., ¶ 23.

The Republican majority's use of political classifications, as reflected by the voting histories of Democratic vs. Republican voters in the precincts in Clarke County, as well as in the surrounding counties affected by SB 386, to draw the new Senate District boundaries burdened the representational rights of Democratic voters in two ways: (1) certain voters, including plaintiff Suarez and plaintiff Blum, had their votes diluted because they were transferred into an overpopulated district *because of the content of their past expression*;[44] (2) all of the voters in Clarke County who have voted, and intend to vote in the future, for Democratic State Senate candidates had their representational rights burdened because SB 386 divided and disbursed voting precincts with large Democratic majorities among Senate Districts that contain large majorities of Republican voters.

The first of these burdens—the State diluting a person's vote because of the content of their past expression—is one of the most insidious types of governmental action in violation of the constitutional guarantees of free speech, and other political freedoms.  "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  This First Amendment protection, for example, forbids the government

---

[44]     Suarez Decl., ¶¶ 3-6; Declaration of Dr. Murray Blum, dated April 26, 2006, ¶¶ 3-6; Declaration of Ann Blum, dated April 26, 2006, ¶¶ 3-6.

from denying governmental employment based upon a person's political party affiliation, *see Elrod*, 427 U.S. at 347, and forbids conditioning of government contracts on support for certain politicians.  *See O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996).  Where the First Amendment provides that government can not withhold such privileges as contracts or employment because a person espouses a particular political viewpoint, it defies belief to conclude that the government can burden the fundamental right to vote based upon the political view point of a particular voter.  In this case, that is precisely what has happened:  three plaintiffs and numerous other Clarke County voters were moved into an overpopulated district, and their vote was therefore diluted, because of the content of their past expression, as evidenced by their historical voting patterns.  Such state action is unconstitutional.

The second of these burdens – the burdening of representational rights by disbursing and dividing groups of Democrats to make it more difficult to elect representatives of the same political party – is equally unconstitutional.  By splitting Athens-Clarke County between two Senate Districts, the Republican majority diluted the influence and power of Democratic voters in Clarke County to elect a Democrat to the Senate for the purpose of guaranteeing insofar as possible the election of a Republican candidate in the previously competitive 46th Senate

District (without, of course, harming Republican chances in the 47th or 49th, which have large Republican majorities).[45]

Indeed, according to the political performance data supplied by the Office of Legislative Reapportionment, SB 386 created districts that, in 2004, voted for Republican candidates as follows: (the percentage reflects the percentage of Republican votes out of the total votes cast)

District 46 -- 57.49% Republican votes

District 47 – 65.83%

District 49 – 68.16%[46]

SB 386 thus burdens the rights of certain disfavored political groups by purposefully making it more difficult for voters in those groups to elect candidates of their choosing.  Such a burden implicates the First Amendment rights of political association.  *See, e.g., Anderson v, Celebrezze*, 460 U.S. 780 (1983) (recognizing that running for office is an act of political association between candidate and supporters).

SB 386 constitutes state action that burdens the first amendment rights of certain voters to associate, and to achieve representation.  SB 386 thus violates the

---

[45]    *See* Kidd Decl., ¶¶ 19-23.

[46]    Kidd Decl., ¶ 23.

very principles Justice Kennedy described in *Vieth*, and should be declared

unconstitutional, absent a compelling state interest. *See* 541 U.S. 267.

Neither of the burdens imposed by SB 386 on the representational and

associational rights of plaintiffs and other Democratic voters residing in Clarke

County were necessary to serve any legitimate and compelling state interest that

was not being served by this Court's existing plan, could not have been

accomplished by the adoption of the FairMadison plan, or in some other way that

would not have burdened or interfered with the First Amendment representational

and associational rights of the plaintiffs.

### C.    SB 386 Violates Art III, § 2, ¶ 2 of the Georgia Constitution

SB 386 violates the Georgia Constitution, because the Constitution only

allows reapportionment of the General Assembly "as necessary after each

decennial census." SB 386 was not constitutionally necessary within the meaning

of this provision, and was adopted after the time allowed for under the

Constitution.

The Georgia Constitution provides as follows:

> The General Assembly shall apportion the Senate and House
> districts. Such districts shall be composed of contiguous territory.
> The apportionment of the Senate and House of representatives shall be
> changed by the General Assembly *as necessary after each United
> States decennial census*.

Ga. Const. Art 3, § 2, ¶ 2 (emphasis added).

This provision was added to the Georgia Constitution in 1976 in response to the series of United States Supreme Court cases requiring adherence to the "one-person, one-vote" rule, *see, e.g.*, *Baker v. Carr*, 369 U.S. 186 (1962); *Reynolds v. Sims*, 377 U.S. 533 (1964), and a series of decisions of a three-judge panel of the federal district court, that forced the Georgia Legislature to reapportion both Houses of the Georgia General Assembly, and the State's Congressional Districts. *See e.g., Toombs v. Fortson*, 205 F. Supp. 248 (N.D. Ga. 1962) (General Assembly); *Wesberry*, 376 U.S. at 1 (Congress).

Thus, the General Assembly is authorized to change the apportionment of State Legislative Districts only "***as necessary*** after each United States decennial census."  This language contemplates both a requirement of necessity ("as necessary") and provides for the timing of any reapportionment ("after each decennial census").

As the Colorado Supreme Court stated recently with regard to Congressional redistricting, despite the fact that state constitutional provisions vary widely, "we have found no decision by any state's highest court that has interpreted its constitution to allow redistricting more than once per decade."  *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1240 (Colo. 2003) (en banc) (collecting cases).

Further, a requirement that redistricting be limited to once per decade "not only is consistent with custom, precedent, and other states' laws, but also rests upon solid policy foundations." *Id.* at 1242 (detailing policy considerations); *see also* Reece Decl., ¶ 9 (noting concerns with frequent alteration of district lines).

Because SB 386 violates both of the requirements laid out in the Georgia Constitution with regard to reapportionment of the legislature, SB 386 is unconstitutional, *ultra vires*, and should be declared null and void.

## II.    The Plaintiffs Would Suffer Irreparable Harm If A Preliminary Injunction Is Not Entered.

Georgia is scheduled to conduct a primary election on July 18, 2006, and a general election in November 7, 2006. Each of the individual plaintiffs will be irreparably harmed if they are forced to vote in districts which were created in violation of the Federal and State Constitutions during the next and subsequent elections.[47] Such harm to their fundamental voting rights would be irreparable. As the *Larios* Court noted, Georgia voters who have had their votes unconstitutionally debased suffer irreparable harm. 305 F. Supp. 2d 1335, 1343; *see also Reynolds*, 377 U.S. at 567 ("To the extent that a citizen's right to vote is debased, he is that much less of a citizen."); *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) ("Given the fundamental nature of the right to vote, monetary

---

[47]        *See, e.g.*, Suarez Decl., ¶¶ 3-6.

remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance.").

In addition, plaintiff Jane Kidd will be irreparably harmed by SB 386, which was adopted after she announced her candidacy for Senate District 46, because the bill was drafted for the specific purpose of discriminating against her based upon her professed political beliefs, her voting record, and her political party affiliation, by making it more difficult, if not impossible, for her or any other Democrat residing in Athens-Clarke County to be elected to the Georgia State Senate.[48] Candidates seeking to run for the General Assembly must qualify between 9:00 a.m. on April 24, 2006 and 12:00 noon on April 28, 2006.[49]

## III.   The Threatened Injury To The Plaintiffs Outweighs Whatever Damages The Proposed Injunction May Cause The Opposing Party.

As discussed above, the threatened injury to the plaintiffs is substantial and irreparable.  There is no counterveiling harm to the defendant if the preliminary injunction is granted because the State would simply use the Senate Districts that were used in the 2004 elections, drawn by the special master at the request of the *Larios* Court, and approved as a constitutional districting plan by that three-judge panel.  Unlike other cases in which the injunction of a state reapportionment plan

---

[48]   *See also* Kidd Decl., ¶ 10.

[49]   Kidd Decl., ¶ 25.

would leave no valid plan in place, the redistricting caused by SB 386 was not

necessitated by a decennial census or malapportioned districts.  The districts drawn

and approved by the *Larios* Court were used in the 2004 elections and the State

would not be harmed by using those districts again in 2006.

## IV.    The Grant Of An Injunction Will Not Adversely Affect The Public Interest.

The public is best served by having districts for elected officials drawn in a

constitutional manner.  The "vindication of constitutional violations is always in

the public's interest." *ACLU of Tenn., Inc. v. Rutherford County*, 209 F. Supp. 2d

799, 813 (M.D. Tenn. 2002); *see also Larios*, 305 F. Supp. 2d at 1344 (public

interest disserved if election occurs under unconstitutional plan); *Indiana Civil

Liberties Union v. O'Bannon*, 110 F. Supp. 2d 842, 858-59 (S.D. Ind. 2000), *aff'd

by* 259 F.3d 766 (7th Cir. 2001); *ACLU v. Pulaski County*, 96 F. Supp. 2d 691, 701-

02 (E.D. Ky. 2000), *aff'd,* 354 F.3d 438 (6th Cir. 2003).  Therefore, for the reasons

set forth above, it is in the public interest to enjoin the unconstitutional redistricting

caused by SB 386.


This 26th day of April, 2006.

Respectfully submitted,


_____/s/ Emmet J. Bondurant_____

Emmet J. Bondurant
Georgia Bar No. 066900
David G.H. Brackett
Georgia Bar No. 068353
Jason J. Carter
Georgia Bar No. 141669

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia  30309
Telephone:  404-881-4100
Facsimile:  404-881-4111
E-mail:        bondurant@bmelaw.com
                   brackett@bmelaw.com
                   carter@bmelaw.com          ***Attorneys for Plaintiffs***

134549

41

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I certify that this Brief complies with the font and point selections set forth in Local Rule 5.1B.  This Brief has been prepared using Times New Roman font (14 point).


                                                                  /s/ David G.H. Brackett

David G.H. Brackett
Georgia Bar No. 068353

## <u>CERTIFICATE OF SERVICE</u>

I, David G.H. Brackett, do hereby certify that I have this day electronically

filed the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT**

**OF THEIR MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of

Court using the CM/ECF system which will automatically send email notification

of such filing to opposing counsel as follows:

> Dennis R. Dunn, Esq.
> Department of Law
> State of Georgia
> 40 Capitol Square, SW
> Atlanta, Georgia  30334
> E-mail:      dennis.dunn@law.state.ga.us

This 26th day of April 2006.


_____/s/ David G.H. Brackett_____
David G.H. Brackett