IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JANE KIDD, ANDREA SUAREZ, | ) | |
| DR. MURRAY BLUM, | ) | |
| and ANN BLUM, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action |
| v. | ) | No. 1:06-CV-0997-BBM |
| | ) | (Three-Judge Panel) |
| CATHY COX, in her official | ) | |
| capacities as Secretary of State of | ) | |
| Georgia and Chair of the State | ) | |
| Election Board, | ) | |
| | ) | |
| Defendant. | ) | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case is the mirror image of *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), *affirmed*, 542 U.S. 947 (2004).

In *Larios*, a challenge by Republican voters, the three-judge court enjoined a reapportionment plan for the Georgia House and Senate drawn by the then Democratically-controlled legislature. The *Larios* Court held that in drawing the districts, the Democrats had not made the "honest and good faith effort to construct districts, in both houses of [the] legislature, as nearly equal of population as is practicable" required by *Reynolds v. Sims*, 377 U.S. 533, 577 (1964), but had deviated from that standard for purely partisan purposes in order to give Democrats

a political advantage over Republicans, by, among other things, giving disproportionate representation to Democratic voters living in the vicinity of Atlanta, and in the rural areas in South Georgia, an area of the State that had lost population relative to North Georgia.

In this case, Democratic voters are challenging a partisan gerrymandering by a Republican-dominated legislature, which amended an indisputably valid reapportionment plan approved by the *Larios* court only two years earlier, by dividing ("cracking") predominantly Democratic precincts in Athens-Clarke County and disbursing and submerging those Democratic precincts among two new senate districts dominated by Republicans that are ***less equal*** in population than the same three districts under the *Larios* plan. Athens-Clarke County is not only the largest municipality in Northeast Georgia (population 101,000), it is also the home of the University of Georgia, the flagship institution of the State's University System. Athens has been the core economic, business, educational, cultural, and medical center for that portion of the State since it was founded in 1803, and has never been divided in any previous reapportionment.

We agree with *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) that "the central and invariable objective" in all cases involving the reapportionment of any elective body must be "that there is 'equal representation for equal number of people'."

*Larios*, 300 F. Supp 2d. at 1337 (quoting *Wesberry*). We, therefore, hold that SB 386 is unconstitutional under the equal protection clause of the Fourteenth Amendment on the same grounds that led the court in *Larios* to declare the Democratic reapportionment of the Georgia House and Senate unconstitutional. The new districts created by SB 386 are *less* equal in population than *either* the comparable districts drawn by the *Larios* court - or the districts under an alternative plan (the FairMadison Plan) that was rejected by a party-line vote in a Republican-dominated reapportionment committee. It is obvious that the new senate districts created by SB 386 were not drawn to be "nearly equal in population as is practicable" as required by *Reynolds*, 377 U.S. at 577. To the contrary, they were intentionally drawn to dilute the voting strength of the Democratic voters of Athens-Clarke County.

Second, it seems very likely that SB 386 was adopted in violation of Art. 3, §2, ¶ 2 of the Georgia Constitution which limits the power of the General Assembly to reapportion state legislative districts by providing that "[T]he apportionment of the Senate and of the House of Representatives shall be changed by the General Assembly as *necessary* after each United States decennial census." The purpose of this provision is to promote stability in government and avoid unnecessary voter confusion by limiting the *frequency* for reapportionment of

legislative districts to once per decade, and thereby preventing partisan gerrymandering of legislative districts every time there happens to be a "regime change" in the General Assembly. SB 386 was not "necessary," as that term is used in Art. 3, § 2, ¶ 2 of the Georgia Constitution, to make the districts conform to the 2000 census because the districts had already been reapportioned by the *Larios* Court in accordance with the one-person one-vote requirement of *Reynolds v. Sims*. It follows, therefore, that SB 386 conflicts with, rather than furthers *legitimate* state interests in maintaining stability and avoiding voter confusion.

Independently of the State Constitution, SB 386 is not justified by any of the interests that may, in the proper case, justify a "minor deviation" from the one-person-one-vote requirement of *Reynolds*.

> While the court has allowed some flexibility in state legislative reapportionment . . . the **central and invariable objective in both instances remains "equal representation for equal numbers of people."** *Wesberry*, 376 U.S. at 18, 84 S.Ct. at 535; *see also Reynolds*, 377 U.S. at 579, 84 S.Ct. at 1390. **Thus, deviations from exact population equality may be allowed in some instances in order to further legitimate state interests such as making districts compact and contiguous, respecting political subdivisions, maintaining the cores of prior districts, and avoiding incumbent pairings**. *See Karcher v. Daggett*, 462 U.S. 725, 740-41 (1983); *Reynolds*, 377 U.S. at 578-79. . . . However, **where population deviations are not supported by such legitimate interests but, rather, are tainted by arbitrariness or discrimination, they cannot withstand constitutional scrutiny.** *See Roman v. Sincock,* 377 U.S. 695, 710 (1964).

*Larios*, 300 F. Supp. 2d at 1320 (emphasis added).

None of these justifications apply in this case. SB 386 was *not* intended to "avoid incumbent pairings" because there is no incumbent running for reelection in senate districts 46 or 49. *Larios*, 300 F. Supp. 2d at 1337-38. SB 386 did *not* "respect political subdivisions," nor did SB 386 "maintain the cores of prior districts." Instead, SB 386 divided Athens-Clarke County, which has been the core business, educational, cultural and medical center not only of senate district 46, but for all of Northeast Georgia for almost 200 years.

"Georgia had a 'strong historical preference' for not splitting counties outside the Atlanta area." *Id.* at 1350. Yet, Senator Hudgens, the sponsor of SB 386, specifically sought to split Athens-Clarke County.

Division of Athens-Clarke County was not necessary to achieve the *stated* goal of SB 386 of "unifying" Madison County (population 25,000) in a single senate district. The same result could have been achieved without dividing Athens-Clarke County by the adoption of the Fair Madison Plan. *See Id.* at 1352 ("[T]he creators of the plans had the technical capability to create maps with substantially smaller population deviations . . . and were actually presented with a number of proposed maps with smaller deviations and systematically rejected them."). The inference is unavoidable that the real purpose of SB 386 was not to "unify" Madison County by placing it entirely within a single senate district, but to

achieve the purely partisan political goal of preventing Democratic voters in Athens-Clarke County from electing a Democratic candidate to the state senate from district 46.

Nor is SB 386 "free from any taint of arbitrariness and discrimination" (*Id.* at 1339 (quoting *Roman*, 377 U.S. at 710)). The changes in district boundaries were neither "neutral nor were [they] consistently applied." *See, Larios, id.* at 1340 (quoting *Brown v. Thompson*, 462 U.S. 835, 845-46 (1983)). As was pointed out during the debate, before the Senate Committee on Reapportionment, Senator Hudgens' argument in favor of SB 386 was hopelessly inconsistent: "On the one hand, [Senator Hudgens] said you don't want to split counties, and on the other, you want to split counties so they can have more representation." Senate Reapportionment Committee Meeting Tr., pp. 11-12 (January 9, 2006).

In summary, SB 386 cannot be distinguished from the Democratic reapportionment plans that were struck down by the three-judge district court in *Larios v. Cox*. Like the earlier Democratic reapportionment plan, SB 386 is not "supported by *any* legitimate, consistently-applied state interests, but rather resulted from the arbitrary and discriminatory objective of increasing the political power of [the Republican party] . . . at the expense of other voters . . . [by] the systematic favoring of [Republican candidates] and the corresponding attempt[] to

eliminate as many [Democratic candidates] as possible" by making it virtually

impossible for a Democrat from Athens-Clarke County to win an election to the

Georgia senate from districts 46 or 47. SB 386, like its Democratic predecessor,

therefore, "represents far more than a 'taint of arbitrariness or discrimination'."

*Larios*, 300 F. Supp. 2d at 1352-53.

We also hold SB 386 invalid under the First Amendment.

SB 386 is a classic example of a partisan gerrymander. "[T]he Supreme

Court has never sanctioned partisan advantage as a legitimate justification for

population deviations" in the reapportionment of legislative districts. *Id.* at 1351.

There is universal agreement among Justices of the Supreme Court that

**"'partisan gerrymanders [are incompatible] with democratic principles.'"**

*Vieth v. Jubelirer*, 541 U.S. 267, 316 (2004) (Kennedy, J. concurring). Partisan

gerrymanders of legislative districts are never viewpoint neutral. They necessarily

rest on legislators' predictions that "'members of certain identifiable groups'"

living in a particular geographic area or voting precinct "'will vote the same way.'"

*Id.* at 326 (Stevens, J. dissenting). The very purpose of a partisan gerrymander is

to classify and discriminate against voters of an opposing political party living in a

discrete geographic area based on their past voting histories, and inevitably lead

"to a system in which the representatives choose their constituents, rather than vice

versa." *Id.* at 332 (Stevens, J. dissenting) (*quoting Session v. Perry*, 298 F. Supp. 2d 451, 516 (E.D. Tex. 2004).

We agree with Mr. Justice Kennedy's concurring opinion in *Vieth*, 541 U.S. at 315:

> The First Amendment may be the more relevant constitutional provision . . . in future cases that allege unconstitutional partisan gerrymandering [because] such gerrymanders have the effect of burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views. Under general First Amendment principles those burdens in other contexts are [subject to strict scrutiny] and are unconstitutional absent a compelling government interest.

*Id.* at 314 (*citing Elrod v. Burns*, 427 U.S. 347, 362 (1976)).

SB 386 is not supported by a state interest that is either legitimate or compelling, and that overrides the First Amendment rights of Democratic voters living in the affected precincts in Athens-Clarke County to be free of viewpoint discrimination based on their voting histories, political associations and political views.

## FINDINGS OF FACT

The 2000 census revealed major changes in the relative populations of legislative districts in the Georgia House and Senate since these districts had last been reapportioned after the 1990 census. Thus, in 2001, the Democratically-

controlled Georgia legislature created reapportionment plans for both houses of the state legislature. The state senate plan was denied pre-clearance under Section 5 of the Voting Rights Act. Joint Stipulation of Facts ("Stip."), ¶¶ 7-8.

In 2002, the legislature responded to this denial by creating a new senate district plan. The Department of Justice precleared the 2002 senate plan pursuant to Section 5, and that plan governed the 2002 elections for the Georgia State Senate. Stip., ¶¶ 9-10.

On February 10, 2004, a three-judge district court in the Northern District of Georgia issued an order declaring that the 2002 senate apportionment plan (and the 2001 house apportionment plan) violated the Fourteenth Amendment's Equal Protection Clause because the plan failed to construct districts as nearly equal in population as practicable. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356, *aff'd*, 542 U.S. 947 (2004).

After the Legislature failed to create a substitute plan, the *Larios* Court issued an order on March 24, 2004, adopting an interim legislative apportionment plan created by the Court's Special Master (the "*Larios* plan").[1] In its March 24 and subsequent explanatory orders, the *Larios* Court ruled that its plan complied

---

[1] The Special Master appointed by the Court to create the plan was the Honorable Joseph W. Hatchett, the former Chief Judge of the Eleventh Circuit Court of Appeals. Stip., ¶ 12.

with the Constitution and all other applicable laws.  There was no appeal from these orders, and the *Larios* plan governed the 2004 election for the Georgia legislature.  Stip., ¶¶ 11-14.

As a result of the 2002 governor's race, and the 2004 legislative elections, the political party of the Governor and of the Majority in the General Assembly have changed.  *See Larios*, 300 F. Supp at 1337.  Republicans now control the Governorship and have an absolute majority in both houses of the General Assembly.  Stip., ¶¶ 25, 27.

## A. Political Circumstances in Senate Districts 46, 47 and 49.

SB 386 only alters the district lines in the three districts in and around Athens-Clarke County.  Stip., ¶ 32.  To explain our conclusions regarding why these districts were singled out for special treatment by the legislature, it is necessary to discuss in detail the political characteristics of the districts and the area.

### 1. *Athens-Clarke County*

Athens is unique in Georgia.  Despite being geographically the smallest county, Athens is by far the largest city in northeast Georgia in terms of population.  Stip., ¶ 51.  It is the home of the University of Georgia, the state's flagship university and Athens Tech, the primary two-year technical college in the

region.  Declaration of Representative Keith Heard ("Heard Decl."), ¶ 6;

Declaration of Representative Jane Kidd ("Kidd Decl."), ¶ 18.  Because of these

and other institutions, Athens has been the educational, cultural, and commercial

center of Northeast Georgia for over two hundred years.

Athens is also unique politically.  In effect, Athens-Clarke County is an

island of Democratic voters in a sea of Republicans.  Plaintiffs' Exhibit ("PX") 1-

3.  Voters in Athens are far more likely to support Democratic candidates than

voters in any of the neighboring counties.  PX 1-3; Kidd Decl., ¶ 19.  For example,

in 2004, Athens-Clarke County was the only county in the area carried by

Democratic Presidential Candidate John Kerry, who received 58% of the vote in

Clarke County, despite only receiving approximately 42% of the state of Georgia's

total votes.  Stip., ¶¶ 19-20.  State senate races have similar results, with Clarke

County being the only county in the region to support a democrat for state senate,

giving Becky Vaughn more than 58% of its votes.  Stip., ¶ 18; PX 1; Kidd Decl.,

¶ 20.

2.    *Senate District 46*

The *Larios* plan placed Athens-Clarke County entirely within senate district

46.  Joint Exhibit ("JX") 1.  Because the plan paired the traditionally Democratic

voters in Athens with voters in two surrounding counties that tend to vote

Republican, District 46 was an extremely competitive district.  Declaration of Ron

Hockensmith ("Hockensmith Decl."), ¶ 15.  In fact, Brian Kemp, the current

Republican incumbent was re-elected to the state senate with 51.6% of the vote in

2004, while losing in Athens-Clarke County, and receiving less than 42% of its

votes.  Stip., ¶¶ 17-18.

In addition, according to the political performance data produced by the

Legislative Reapportionment Services Office (LRSO),[2] District 46 is one of the

most competitive districts in Georgia.  Hockensmith Decl., ¶ 15.  In fact, over the

last 3 elections in District 46, the average percentage of overall Republican votes

cast is almost identical to the average percentage of Democratic votes.

Hockensmith Decl., ¶ 18.

By contrast, the other two senate districts, 47 and 49, tend to vote

Republican consistently and overwhelmingly.  Hockensmith Decl., ¶ 18; Kidd

Decl., ¶ 19.  The precise data from the LRSO shows the difference among the three

---

[2]    The Legislative Reapportionment Services Office is a non partisan agency
operated by the University of Georgia, but contracted with the Legislature to
provide population and other data to candidates, legislators, and apportionment
plan drafters.  In addition to demographic and population data they are able to
calculate political performance data for the territory encompassed by certain
districts.  Stip., ¶¶ 30, 59-62.

districts, according to the overall percentage of Republican and Democratic votes, averaged over three elections, as follows:

| District | Overall Republican votes 2000-2004 | Overall Democratic votes 2000-2004 | Margin (Republican over Democratic) |
|---|---|---|---|
| 49 | 68.16% | 27.83% | 40.33% |
| 47 | 62.80% | 29.80% | 33.00% |
| 46 | 47.59% | 48.89% | (-1.3%) |

Hockensmith Decl., ¶ 18.

These numbers reflect that, on average under the *Larios* plan, District 46 was far more competitive between Democrat and Republican Candidates than the other two districts. Hockensmith Decl., ¶ 18; Kidd Decl., ¶ 19. In fact, of all the Georgia senate seats held by a Republican, District 46 was the most vulnerable. According to the LRSO's data, of all the seats in the senate held by a Republican, District 46 had the lowest overall republican voting average, and the highest overall democratic voting average. Hockensmith Decl., ¶ 16.

3.    *The upcoming 2006 election*

After the 2004 election, the Republican incumbent in District 46, Brian Kemp, announced that he would vacate his senate seat to run for the statewide

office of Agriculture Commissioner.  Stip., ¶ 21.  This announcement meant that there would be no Republican incumbent running in the extremely competitive District 46.  Within days, Jane Kidd, a Democratic State representative who represents a portion of Athens-Clarke County, announced that she would run for the senate in district 46.  Kidd Decl., ¶ 6.

For months she had no Republican opposition, until Brian Kemp's brother-in-law, Bill Cowsert, announced that he would run for the Republican nomination.  Kidd Decl., ¶¶ 7-8.  Kidd and Cowsert had already competed against each other in 2004, in Clarke County's House District 115.  Stip., ¶ 22.  Kidd received 56% of the vote in that election.  *Id.*

Thus, not only did the raw numbers augur ill for the Republican party's chances in District 46, but the actual candidates did as well.

It was in this political context that SB 386 was introduced in the state senate.

**B.     The passage of SB 386**

On the first day of the 2006 legislative session, Senator Ralph Hudgens, the incumbent Senator in District 47 introduced SB 386 in the Senate Reapportionment Committee.  Stip., ¶ 23.  He stated that the purpose of the bill was to unify Madison County within one senate district, as the *Larios* plan had placed one Madison County precinct in the 46th district, while the remainder of the county was

in the 47th.  Stip., ¶ 31.  He also stated that he wanted to "increase[ ] the representation of Clarke County" by splitting the county between two senate districts.  Declaration of Senator Ralph T. Hudgens ("Hudgens Decl."), ¶ 10.

SB 386 reapportioned the three senate districts in and around Athens as follows: (1) it split Athens-Clarke County between the 46th and 47th districts by moving six and one half (6 1/2) precincts in the eastern half of Clarke County from district 46 to district 47; (2) it moved all of Oglethorpe county from the 46th district to the 47th district; (3) it took all twelve of the precincts in Walton County that had been in district 47 and placed them in district 46, and (4) it moved the one Madison County Precinct from the 46th district to the 47th district.  SB 386 also made minor alterations to the border between districts 47 and 49.  Stip., ¶ 32.

The plan was adopted by the Republican majority of the General Assembly in a completely partisan manner.  Stip., ¶¶ 25-28; Declaration of Barbara Reece ("Reece Decl."), ¶ 18; Declaration of Senator Robert Brown ("Brown Decl."), ¶ 11.  There was no consultation at all with any Democrats in either the House or Senate, including those Democrats in the House that represent the areas affected by the legislation.  Kidd Decl., ¶¶ 13-14; Heard Decl., ¶ 18; Brown Decl., ¶ 11.  Further, the plan was passed in a purely partisan manner, passing out of each committee in both the Senate and the House on straight party line votes, and

passing the Senate and House by virtually identical party line votes.  *Id.*  Indeed, throughout the process of passage, there was not a single Republican who cast a dissenting vote.  Stip., ¶ 28.  Not a single Democratic Senator voted for the bill, and only 4 of the 79 Democrats in the House supported it.[3]  Stip., ¶¶ 25, 27.

**C.     SB 386 was Adopted Despite the Fact that it is Less Equal in Population and Violates Traditional Reapportionment Interests**

*1.     SB 386 itself violates fundamental reapportionment principles*

To the extent that SB 386 amended the *Larios* plan, it also violated each and every principle embodied in that court's February 10, 2004 Order.

Initially, we note that reapportionment of these districts was, as a matter of fact, ***not required*** in order to serve any of the interests normally associated with reapportionment, particularly reapportionment that occurs after a decennial census. A valid statewide senate district map, the *Larios* plan, was already in existence. Stip., ¶ 13.  The *Larios* Court had already determined that the *Larios* plan sufficiently addressed all necessary constitutional and legal issues, and served well the interests attendant to reapportionment, including both the general interests and

---

[3]     Since the end of the legislative session, three of those four Democrats have switched parties and will seek reelection in their districts as Republicans.  Heard Decl., ¶ 19.

those specific to the State of Georgia. *Id.*; *see also Larios v. Cox*, 314 F. Supp. 1357, 1364 (N.D. Ga. 2004).

Secondly, the district plan created by SB 386 is undeniably less equal in population than the *Larios* plan. Under SB 386, the difference in population between the largest and smallest district is 2,381 people. Under the *Larios* plan, the difference in population is 1,653.[4]

In addition to being less equal in terms of population, SB 386 moves voters in 29 ½ precincts into a new senate district. Stip., ¶ 32; Reece Decl., ¶ 8. Because of the legal issues involved in the reapportionment after the 2000 census, SB 386 would represent the ***fourth*** state senate plan for these voters since 1999. Stip.,

---

[4]     The specific population deviations of the two plans are as follows:

|  | *Larios* plan | SB 386 |
|---|---|---|
| Difference in population between the largest and smallest district, or "Absolute Overall Range" (# of persons) | 1,653 | 2,381 |
| Total population deviation as a percentage of the ideal district, or "Relative Overall Range." | 1.13% | 1.63% |

Stip., ¶¶ 39-42.

¶ 35. In other words, they would have voted under a different state senate plan in every election this decade.[5]

Further, SB 386 violates many, if not all, of the traditional interests attendant to legislative reapportionment. As the Court recognized in *Larios*, there are several state interests that may be served when apportioning districts in the state legislature. The state interests that may justify "deviations from exact population equality" are the interests in "making districts compact and contiguous, respecting political subdivisions, maintaining the cores of prior districts and avoiding incumbent pairings." *Larios*, 300 F. Supp. 2d at 1337. In addition, courts have recognized that Georgia itself has "a strong historical preference … for not splitting counties outside the Atlanta Area, and not splitting precincts, maintenance of core districts, and recognition of communities of interest. *Id.* at 1349 (*quoting Abrams v. Johnson,* 521 U.S. 74, 99-100 (1997)). Stip., ¶ 49.

As a matter of fact, SB 386 serves none of these interests. SB 386 does not address any **lack** of compactness or contiguity (Stip., ¶ 13), and it does not seek to

---

[5]    The reapportionment based on the 1990 census governed the 2000 election, the Legislature's 2002 plan governed the 2002 elections, and the *Larios* plan governed the elections in 2004. SB 386 would govern the election in 2006. Stip., ¶ 35.

avoid any incumbent pairing.  Stip., ¶ 21; Affidavit of Senator Casey Cagle

("Cagle Aff."), ¶¶ 2-3.

SB 386 divides Clarke County for the first time in the county's history (JX

5), splitting a county and destroying the "core" of a state senate district as it had

been constituted for generations.  JX 5; PX 3.  SB 386 also splits a precinct in

Clarke County. Stip., ¶ 34.

In addition, SB 386 divides many communities of interest within Clarke

County.  SB 386 divides each of Clarke County's state House seats.  Kidd Decl.,

¶ 17; Heard Decl., ¶ 5.  It divides several of the county commission districts, and it

divides the two major "attendance zones" that determine which of the County's

elementary, middle and high schools a child will attend.  Kidd Decl., ¶ 17; Heard

Decl., ¶¶ 5-9.  These political subdivisions are, by definition, communities of

interest.  In addition, SB 386 divides the University of Georgia community by

severing certain portions of the campus, and by dividing the community of

professors and students.  Kidd Decl., ¶ 18.

2. *The Republican majority rejected the FairMadison plan, which was more equal and better served traditional reapportionment interests*

Not only did the sponsors and supporters of SB 386 chose this plan despite

its (1) being less equal, (2) disturbing a large number of voters for the fourth time

in four elections, and (3) splitting Clarke County and numerous communities of

interest within Clarke County, but they chose this bill with other, more obvious options available.

An alternative reapportionment plan, labeled the "FairMadison" plan was presented in the House Reapportionment Committee and remedied virtually all of these problems. JX 4B; Reece Decl., ¶ 8. It achieved SB 386's purported goal of unifying Madison County, and it also kept Clarke County whole, disturbed far fewer voters by changing the districts for only four precincts, avoided any splitting of precincts, and it was ***more equal in population*** than SB 386. JX 4, 4A, 4B; Reece Decl., ¶ 12.

In addition, the idea for the Fair Madison proposal is obvious on the face of the LRSO's "Plan Components Report" for the *Larios* plan because the population in the portion of Madison county that is in the 46th district is almost identical to the population in the portion of Elbert county that is in the 47th. JX 4B. The Fair Madison plan merely swaps those two populations, and makes district 46 and 47 more equal in population. JX 4, 4B; Reece Decl., ¶ 7. Nonetheless, the House Reapportionment committee rejected the FairMadison plan by the same purely partisan vote by which it passed SB 386. Reece Decl., ¶ 13.

In sum, the legislature was faced with three options: the *Larios* plan, the FairMadison plan, and SB 386. Plainly, the Republican majority in the General

Assembly chose the plan that was the least equal,[6] and the most harmful to traditional redistricting principles.

**D.    The True Purpose of SB 386 was Partisan Political Gain**

Despite the defendant's claims that no Republican consulted the State's official political performance data, we conclude that the Republican majority in the General Assembly adopted SB 386 for the purpose of dividing the traditionally democratic voters in Athens Clarke county between two state senate districts, to reduce the competitiveness of district 46, and make it easier for a Republican to win that seat.  As the Supreme Court has indicated, "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended."  *Vieth v. Jubelirer,*

---

[6]    Based upon reports from the Legislative Reapportionment Office, the specific population deviations of the three plans are as follows:

|  | Court's Plan | FairMadison Plan | SB 386 |
|---|---|---|---|
| Difference in population between the largest and smallest district, or "Absolute Overall Range" (# of persons) | 1,653 | 1,1715 | 2,381 |
| Total population deviation as a percentage of the ideal district, or "Relative Overall Range." | 1.13% | 1.17% | 1.63% |

Stip., ¶¶ 39-42, 46-47.

541 U.S. 267, 281 (2004) (quotation marks omitted).  Indeed, in this case, the partisan political consequences provide the only viable explanation for the choices that were made.

        *1.*      *The political consequences of SB 386 are undeniable*

The political consequences of SB 386 are clear.  Each of the six and a half Clarke County precincts that were moved from the 46th to the 47th were traditionally Democratic precincts.  Kidd Decl., ¶ 22; Heard Decl., ¶¶ 11, 14, 17.  The removal of those voters from the 46th, made it far more likely that a Republican would be elected in that district.

Whether or not the Republican drafters and supporters of SB 386 consulted the precise political performance data issued by the LRSO, they had knowledge that dividing the traditionally democratic voters of Clarke County would benefit republican candidates in senate district 46.  *See* Declaration of Senator Eric Johnson ("Johnson Decl."), ¶ 9.

Senator Hudgens' affidavit states that he represented certain portions of Clarke County and that he was very familiar with the community.  Hudgens Decl., ¶ 2.  It is impossible to believe that he was unaware of Clarke County's unique political make-up.  In addition, it is unreasonable to conclude that Senator Hudgens and any of the other Republican senators who supported the bill were unaware of

2004 election results which showed the Republican incumbent's narrow margin of victory in district 46, and the enormous margins of victory in the surrounding districts. *See* Stip., ¶¶ 15-17.

Indeed, in his affidavit, Senator Eric Johnson, the Senate Majority Leader, specifically assumed that Senator Hudgens would be re-elected while arguing that Athens deserved a "veteran" law maker like Senator Hudgens. Johnson Decl., ¶ 10(e).

Further, the actual political changes are so severe that it would be difficult to believe that the partisan political results were accidental. The political performance data shows that, under the *Larios* plan, district 46 was one of the five seats in the Georgia state senate without either party having an average historical voting percentage over 50%. Hockensmith Decl., ¶¶ 15-16. District 46's overall Republican voting percentage was 47.59%. The overall Democratic voting percentage was 48.89%. *Id.* at ¶ 18. Indeed, compared to all of the other seats in the Georgia senate that are currently held by a Republican, under the *Larios* plan district 46 had the lowest overall Republican voting percentage, and the highest overall Democratic voting percentage, in theory making district 46 the most vulnerable state senate seat held by the Republicans. Hockensmith Decl., ¶ 16.

By contrast, under SB 386, it becomes far more likely for a Republican to be elected. Specifically, the difference between the Republican overall voting percentage and overall democratic voting percentage changes from a 1.13% Democratic margin, to a 9.78% Republican margin.[7] In addition, the overall Republican voting average rises to 51.95%. Hockensmith Decl., ¶ 19. In Georgia, there is no state senate district where one party has an overall voting percentage above fifty percent that is held by a member of the other party. *Id.*

This political performance data shows that the plan dramatically benefits Republicans.[8] It also provides an explanation for the rejection of the FairMadison

---

[7]    According to the data supplied by LSRO, the specific average historical voting percentages for District 46 are as follows:

| District | Overall Republican votes 2000-2004 | Overall Democratic votes 2000-2004 | Margin (Republican over Democratic) |
|---|---|---|---|
| District 46 under *Larios* plan | 47.59% | 48.89% | (-1.3%) |
| District 46 under SB 386. | 51.95% | 42.17% | 9.78% |

Hockensmith Decl., ¶¶ 18-20; Stip. ¶¶ 59-61 and exhibits.

[8]    SB 386 makes it easier for a Republican to be elected in District 46 without harming the Republican chances in the surrounding districts. The political performance numbers for Districts 46 and 47 remain demonstrably favorable to Republicans. Specifically, under SB 386, the political performance numbers for those two districts are as follows:

plan, because under that plan, senate district 46 would remain competitive.[9]

Hockensmith Decl., ¶ 22; Stip. ¶ 62 and exhibit.  This data, coupled with the past

history between the likely candidates from each party, where the Democrat Kidd

had already defeated the Republican Cowsert in a race for the State house (Stip.,

¶ 22), provides a strong motive for the Republican majority to reject other more

sensible reapportionment plans.

In light of the ***undisputed partisan*** nature of SB 386's passage in the

General Assembly, when it was supported by every Republican, and only one

current Democrat, it is simply unreasonable to conclude that these stark political

| District (under SB 386) | Overall Republican votes 2000-2004 | Overall Democratic votes 2000-2004 | Margin (Republican over Democratic) |
|---|---|---|---|
| 49 | 68.16% | 27.81% | 40.35% |
| 47 | 58.00% | 36.46% | 21.54% |

Hockensmith Decl., ¶ 19; Stip. ¶ 61 and exhibit.

[9] The average historical voting percentages under the Fair Madison plan would be as follows:

| District | Overall Republican votes 2000-2004 | Overall Democratic votes 2000-2004 | Margin (Republican over Democratic) |
|---|---|---|---|
| 46 (FairMadison) | 47.31% | 49.02% | (-1.71%) |

results were accidental.  The overwhelming circumstantial evidence shows that SB 386's purpose was partisan political gain.

  2. *The other purported explanations for SB 386 are unpersuasive, and likely pretextual*

  Our conclusion is further supported by the pretextual nature of the bill's purported purposes.  Splitting Clarke County was admittedly intended.  Hudgens Decl., ¶ 10; Johnson Decl., ¶ 7(c).  There is no suitable justification for this split.  Splitting Clarke County was necessary to unify Madison County, as shown by the FairMadison plan that kept both counties whole while creating districts that are more equal, and disturbing fewer voters.  Stip., ¶ 48; Reece Decl., ¶¶ 7-11.

  In addition, the claim that the bill sought to increase the representation of Clarke County is illogical.  First, any reasons for placing Madison County entirely within a single district also apply to Clarke County.  Second, the credibility of this purported purpose is undermined because the senator who made this suggestion does not represent any part of Clarke County and kept SB 386 almost completely secret prior to its introduction in the senate.  Kidd Decl., ¶¶ 14-16.

  There were no public meetings of any kind with regard to the proposed bill.  *Id.*  Not one of Clarke County's elected officials was informed.  *Id.*  And, despite the bill purportedly being offered for their benefit, the Madison County Commission was not even informed.  PX 5; Second Affidavit of Jane Kidd and

Complaint ¶ 34.  Indeed, Senator Hudgens admitted in the Senate Reapportionment

Committee that that "none of the folks back home" who were affected by the bill

had seen it.  Stip., Exhibit C, p. 6.

Further, this purported purpose flies in the face of the long standing

historical preference in Georgia for not splitting counties.  Stip., ¶ 49.  Indeed, to

the extent that a reason was offered, that reason is so clearly pretextual that it

support an inference that there is another ulterior motive.  Senator Hudgens and the

Defendant's claims that many of the counties are larger than Clarke County have

multiple Senators neglects the fact that 9 of the 13 counties discussed *require*

multiple Senators because they have populations greater than the ideal senate

district.  Defendant's Exhibit ("DX") 4; *see also* Stip., ¶ 38.

Thus, based upon all the evidence, including the pre-textual nature of certain

purported explanations of the bill, we conclude that that true purpose of SB 386

was partisan political gain for the Republican party, and that this was achieved by

dividing the traditionally democratic voters in Clarke County into two senate

districts in order to make it more difficult for a Democrat to be elected in district

46.

## CONCLUSIONS OF LAW

1.     The Equal Protection Clause of the Fourteenth Amendment

The legal principles that apply to reapportionment cases under the equal protection clause have been well-established for over forty years.

*First*, the central and invariable objective of any statute apportioning seats in an elective body must be to provide "equal representation for equal numbers of people." *Wesberry*, 376 U.S. at 18; *Larios*, 300 F. Supp. 2d at 1337.

*Second*, a "state is . . . required" by the equal protection clause to "make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Reynolds*, 377 U.S. at 577; *Larios*, 300 F. Supp. 2d at 1339.

*Third*, "deviations from exact population equality may be allowed in order to further *legitimate* state interests," *Larios*, 300 F. Supp. 2d at 1337; *see also Karcher v. Daggett*, 462 U.S. 725, 740-41 (1983), but a state reapportionment act that violates the state's own constitution cannot, by definition, be one that "furthers a *legitimate* state interest."

*Fourth*, the only state interests that have been identified by the Supreme Court as "legitimate" reasons for a departure from the rule of exact population equality in redistricting are:

       (a)     making districts compact and contiguous;

(b)     avoiding the unnecessary division of political subdivisions;

(c)     maintaining  the core of prior districts (if it becomes necessary to divide prior districts in a subsequent reapportionment in order to comply with the one-person-one-vote rule); and

(d)     avoiding *incumbent pairings*.

*Karcher*, 462 U.S. at 725; *Larios*, 300 F. Supp. 2d at 1337-38; *see also id.* at 1348 ("only the prevention of contests *between incumbents*, *rather* than . . . *incumbency protection* [is] a legitimate state goal [that will support] population deviations").

*Fifth,* protection of a political party's majority status in the State legislature or its control over a particular legislative seat or district is not a legitimate state interest.  *See Id.* at 1351.

"The Supreme Court has never sanctioned partisan advantage [in political gerrymandering] as a legitimate justification for population deviation . . . [and] there is some suggestion that the Supreme Court would reject such political reapportioning."  *Id.* at 1351 & n.15 (*citing Abate v. Mundt*, 403 U.S. 182, 187 (1971); *Brown*, 462 U.S. at 843-44); *see also Vieth*, 541 U.S. at 315 (Kennedy, J. concurring).

*Sixth*, when a state seeks to justify a deviation from population equality based on an alleged "legitimate state interest," the court must evaluate not only the

strength and legitimacy of the interest itself, the court must also "consider '[t]he *consistency* of application and the *neutrality* of effect of [those] nonpopulation criteria' in order to determine whether a state legislative apportionment plan violates the Fourteenth Amendment." *Larios*, 300 F. Supp. 2d at 1340 (quoting *Brown*, 462 U.S. at 845-46) (emphasis added).

*Seventh*, a reapportionment statute that deviates from the norm that electoral districts be "as nearly equal in population as is practicable," must also be "free from the taint of arbitrariness or discrimination." *Roman*, 377 U.S. at 710; *Larios,* 300 F. Supp. 2d at 1341.

*Eighth*, where, as here, the deviation in populations between the largest and smallest district is less than 10%, plaintiffs cannot rely on the population difference *alone* to establish a *prima facie* case under the Fourteenth Amendment, but must "produce further evidence to show that the apportionment process had a 'taint of arbitrariness or discrimination'." *Larios*, 300 F. Supp. 2d at 1340. In the case of SB 386, the evidence produced by the plaintiffs is more than sufficient to carry this burden.

2.    <u>SB 386 violates the equal protection clause and is unconstitutional.</u>

The "central and invariable objective" of the equal protection clause is that there be "equal representation for equal numbers of people." *Larios,* at 1337 (quoting *Wesberry*, 374 U.S. at 18).  That was *not* the objective of SB 386.

The population numbers speak for themselves and conclusively establish a violation of the *Reynolds v. Sims* one-person one-vote rule. Senate districts 46, 47 and 49 created by SB 386 are not as equal in population as are the previous senate districts 46, 47 and 49 created by the *Larios* Court, which SB 386 purports to "amend."

|                                                                                   | **Court Plan** | **SB 386**      |
| --------------------------------------------------------------------------------- | -------------- | --------------- |
| "Absolute Deviation" between most and least populous of Senate districts 46, 47 and 49 | 1,653 persons  | 2,381 persons   |
| Deviation as a percentage of the ideal district                                   | 1.13%.         | 1.63%           |

The FairMadison Plan would have achieved the stated objective of SB 386 by putting Madison County in a single legislative district, but without dividing Athens-Clarke County, without dividing any additional voting precincts, and would have created senate districts that are more nearly equal in population that the

districts created by SB 386:

| | FairMadison Plan | SB 386 |
|---|---|---|
| "Absolute Deviation" between most and least populous of Senate districts 46, 47 and 49 | 1,715 persons | 2,381 persons |
| Deviation as a percentage of the ideal district | 1.17% | 1.63% |

Thus, by amending the *Larios* plan and rejecting the FairMadison plan in favor of SB 386, instead of making an honest, good faith attempt to create new senate districts that would be "as nearly equal in population as is practicable," as required by *Reynolds v. Sims*, the sponsors of SB 386 (just as in *Larios*) did the exact opposite.

In determining whether SB 386 "furthers a ***legitimate*** state interest," the Court must first consider whether SB 386 was adopted in violation of Art. 3, § 2, ¶ 2 of the Georgia Constitution because the State Constitution is the paramount document that defines whether and when a statute is deemed ***by the State*** to be in furtherance of ***its*** own interests. To put it another way, a state has no interest in sanctioning a violation of its ***own*** constitution and a statute which does so cannot, by definition, be in furtherance of a ***legitimate*** state interest. It follows, therefore,

that if SB 386 was adopted in violation of a state constitution, it cannot be considered to be in furtherance of a ***legitimate*** state interest.

Art. 3, § 2, ¶ 2 of the Georgia Constitution provides:

**Apportionment of the General Assembly**

The General Assembly shall apportion the Senate and House districts. Such districts shall be composed of contiguous territory. ***The apportionment of the Senate and of the House of Representatives shall be changed by the General Assembly as necessary after each United States decennial census.***

Ga. Const. Art. 3 § 2 ¶ 2 (emphasis added).

The legislative districts in Georgia had already been validly reapportioned by the *Larios* Court in 2004 to reflect the changes in population under the 2000 census and to conform to the requirements of *Reynolds v. Sims*. The interim reapportionment plan adopted by the *Larios* court was and is valid and binding on the State and no further amendments to the plan were "necessary" for another four years until after the 2010 decennial census. This provision was added to the 1976 Constitution apparently for the purpose of promoting both ***stability*** in government and to avoid ***voter confusion*** by limiting the frequency in which legislative districts may be amended by the General Assembly to once per decade (*i.e.*, only "as necessary after each decennial census"). *See People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1240 (Colo. 2003) ("[W]e have found no decision by any

state's highest court that has interpreted its constitution to allow redistricting more than once per decade.").  SB 386, therefore, was not adopted to "further a legitimate state interest" because it was adopted in violation of Article 3, § 2, ¶ 2 of the Georgia Constitution.

SB 386 would still be invalid under the equal protection clause even in the absence of a limitation in the Georgia Constitution on the frequency of amendments to state legislative districts under the Fourteenth Amendment:

> [D]eviations from exact population equality *may* be allowed *in some instances* in order to further legitimate state interests such as making districts compact and contiguous, respecting political subdivisions, maintaining the cores of prior districts, and avoiding incumbent pairings. *See Karcher v. Daggett*, 462 U.S. 725, 740-41 (1983) . . .  However, where population deviations are not supported by such legitimate interests, but rather are tainted by arbitrariness or discrimination, they cannot withstand constitutional scrutiny. *See Roman v. Sincock*, 377 U.S. 695, 710 (1964).

*Larios*, 300 F. Supp. 2d at 1337-38 (emphasis added).

As explained above, SB 386 was neither (1) necessary to further some overriding and legitimate state interest nor (2) is SB 386 "free of the taint of arbitrariness and discrimination," because its primary, if not sole, purpose was and is to strengthen the Republican majority's hold on the legislature by preventing Democratic voters in Athens-Clarke County from having a free opportunity to elect a Democrat to fill the open seat in district 46, after the Republican incumbent, Brian Kemp, announced his intention to run for Secretary of Agriculture.

The State does not even **pretend** that the purpose of SB 386 was to further any of the interests that have been identified by the Supreme Court as justifying a departure from the constitutional norm that districts be "as nearly of equal population as is practicable," and deviate "from a strict population standard [ ] based on legitimate considerations incident to the effectuation of a rational state policy." *Larios, Id.* at 1353 (quoting *Reynolds,* 377 U.S. at 577).

The only legitimate and recognized justification for SB 386 put forth by its sponsor, Republican Senator Ralph Hudgens, was that he wanted to "unify" Madison County by including it in a single senate district. Under the *Larios* plan, 20% (5,127) of the residents of Madison County were placed in district 46, and the other remaining 80% (20,603) of the residents of Madison County were placed in district 47. If the real objective of SB 386 had been to "unify" Madison County in a single senate district, that result could have been easily accomplished **without** dividing Athens-Clarke County (101,484) and **without** making the districts **less** equal in population than the districts under the *Larios* plan. SB 386 could have simply exchanged that portion of Elbert County in district 47, which contained 5,420 people, for the 5,127 Madison County residents in district 46. This exact solution was the genesis of the FairMadison Plan. The fact that the FairMadison Plan was rejected by a straight party line vote by the Republican-dominated House

Committee on Reapportionment is convincing evidence that the objective of SB 386 was **not** to unify Madison County in a single legislative district.

In addition, as discussed above, the argument that "increasing representation for Clarke County can justify the deviations in SB 386 is not only pretextual, but it flies in the face of the legitimate interests identified by the Court's as justifying population deviations. At worst, this "interest" is not free from the taint of arbitrariness or discrimination as required.

Indeed, the conclusion is inescapable that the real purpose of SB 386 was to discriminate against and diminish the political influence of Democratic candidates and voters residing in Athens-Clarke County by "cracking" – dividing the Democratic precincts in Athens-Clarke County and placing the 23,623 residents in Athens-Clarke County into district 47 which has a large Republican majority.

3.      SB 386 is invalid under the First Amendment

A political gerrymander is defined as "the practice of dividing a geographical area into electoral districts . . . for the purpose of giving one political party an unfair advantage by diluting the influence or voting strength of voters in the opposing party [or parties]. One way in which this is done is by deliberately separating certain voters (*i.e.* "cracking" their communities) and placing them in

districts in which they will be at a distinct political disadvantage." *Vieth*, 541 U.S. at 272 n. 1 & 286 n.7.

There is universal agreement among the Justices of the Supreme Court that "partisan gerrymanders [are incompatible] with democratic principles." *Vieth*, *Id.* at 292. *Compare* Justice Scalia's plurality opinion in *Vieth* at p. 292 with that of Justice Kennedy, *supra*, at p. 316. *Davis v. Bandemer*, 478 U.S. 109 (1986). Computers have increased the "efficiency of partisan redistricting [and have] damaged the democratic process to a degree" that would have been unimaginable only a few years ago. *See Vieth*, 541 U.S. at 345 (Souter, J. dissenting); Samuel Issacharoff, *Gerrymandering and Political Cartels*, 116 Harv. L. Rev. 593, 624 (2002); Pamela S. Karlan, *The Fire Next Time: Reapportionment After the 2000 Census*, 50 Stan. L. Rev. 731, 736 (1998).

Although challenges to political gerrymandering are justiciable (*Davis v. Bandemer*, 478 U.S. 109 (1986), *Vieth*, 541 U.S. at 267), challenges based on the equal protection clause of the Fourteenth Amendment have failed because of the inability of a majority of the members of the Supreme Court to agree upon manageable standards for adjudicating political gerrymander cases under the equal protection clause.

Justice Kennedy has provided a new insight and approach to political gerrymander cases. According to Justice Kennedy, plaintiffs have been barking up the wrong tree by proceeding under the equal protection clause. He suggests that "The First Amendment may be the more relevant constitutional provision in future cases that allege unconstitutional partisan gerrymandering." *Vieth*, 541 U.S. at 314.

> The First Amendment may be the more relevant constitutional provision in future cases that allege unconstitutional partisan gerrymandering. . . . [t]hese allegations involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views. Under general First Amendment principles those burdens in other contexts are unconstitutional absent a compelling government interest.
>
> * * * *
>
> First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views. In the context of partisan gerrymandering, that means that First Amendment concerns arise where an apportionment has the purpose and effect of burdening a group of voters' representational rights.
>
> * * * *
>
> The inquiry is not whether political classifications were used. The inquiry instead is whether political classifications were used to burden a group's representational rights. If a court were to find that a state did impose burdens and restrictions on groups or persons by reason of

their views, there would likely be a First Amendment violation, unless the state shows some compelling state interest.

*Id.* at 314-15.

As Justice Kennedy has pointed out, allegations of willful and deliberate political gerrymandering directly "involve the First Amendment interest of not burdening or penalizing citizens because of their participating in the electoral process, their voting history, their association with a political party, or their expression of political views." *Id.* at 314.

There is no absence of standards for adjudicating the validity under the First Amendment of the statutes that discriminate based on content of communication or the viewpoints of persons affected by the statute. Such statutes are subject to strict scrutiny. As the Supreme Court held more than 30 years ago, statutes that are presumptively unconstitutional and cannot be justified are a mere showing of a legitimate state interest. *Elrod v. Burns*, 427 U.S. 347, 362-63 (1976). The state interest must be "paramount [and] of vital importance." *Id.* It is not enough that the statute be "rationally related" to legitimate state interest as the "gain to the subordinating interest . . . must outweigh the incurred loss of protected rights." *Id.* If the state has open a less drastic way of satisfying its legitimate interests, it must choose the least restrictive alternative and may not choose a legislative scheme that unnecessarily infringes on fundamental First Amendment rights. *Id.*

This 2nd day of May, 2006.

Respectfully submitted,


_____/s/ Emmet J. Bondurant_____
Emmet J. Bondurant
Georgia Bar No. 066900
David G.H. Brackett
Georgia Bar No. 068353
Jason J. Carter
Georgia Bar No. 141669

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia  30309
Telephone:  404-881-4100
Facsimile:  404-881-4111
E-mail:      bondurant@bmelaw.com
                 brackett@bmelaw.com
                 carter@bmelaw.com          *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** with the

Clerk of Court using the CM/ECF system which will automatically send email

notification of such filing to opposing counsel as follows:

> Dennis R. Dunn, Esq.
> Department of Law
> State of Georgia
> 40 Capitol Square, SW
> Atlanta, Georgia  30334
> E-mail:        dennis.dunn@law.state.ga.us

This 2nd day of May 2006.

>               /s/ Emmet J. Bondurant
> Emmet J. Bondurant