IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JANE KIDD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | NO. 1:06-CV-0997 - BBM |
| v. | ) | (Three-Judge Court) |
| | ) | |
| CATHY COX, in her official | ) | |
| capacities as Secretary of State and | ) | |
| Chair of the State Election Board, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**COMES NOW** Cathy Cox, Secretary of State, Defendant in the above-styled action, by and through Counsel Thurbert E. Baker, Attorney General for the State of Georgia, and submits for the consideration of this Court her proposed Findings of Fact and Conclusions of Law in accordance with this Court's order of April 28, 2006:

## FINDINGS OF FACT

### Structure of Georgia Government

1.

The Georgia State Senate consists of 56 Senators elected from single member districts apportioned among the respective districts of the State of

Georgia.  Ga. Const., Art. III, Sec. II, Par. I(a); O.C.G.A. § 28-2-2.

2.

Members of the Georgia Senate are elected for two-year terms and serve until the time of the convening of the next General Assembly.  Ga. Const., Art. III, Sec. II, Par. V(a).

3.

Members of the Georgia Senate are elected at the same time as the Governor.  Ga. Const., Art. V, Sec. I. Para. II.

4.

Article III, Section II, Paragraph II of the Georgia Constitution provides:

> The General Assembly shall apportion the Senate and House districts.  Such districts shall be composed of contiguous territory.  The apportionment of the Senate and House of representatives shall be changed by the General Assembly as necessary after each United States decennial census.

Redistricting of the Georgia Senate – Statewide Plans

5.

In 1971, the Georgia General Assembly adopted a statewide redistricting plan after receiving the results of the 1970 decennial Census.  1971 Ga. Laws Ex.

Sess. 69.  This Act included a description by Census tract and block of all 56 districts of the Georgia Senate.  *Id.*

6.

In 1981, the Georgia General Assembly adopted a statewide redistricting plan after receiving the results of the 1980 decennial Census.  1981 Ga. Laws Ex. Sess. 103.  This Act included a description by Census tract and block of all 56 districts of the Georgia Senate.  *Id.*

7.

In 1991, the Georgia General Assembly adopted a statewide redistricting plan after receiving the results of the 1990 decennial Census.  1991 Ga. Laws Ex. Sess. 124.  This Act included a description by Census tract and block of all 56 districts of the Georgia Senate.  *Id.*

8.

In 1995, after the decision of the U.S. Supreme Court in *Miller v. Johnson*, 515 U.S. 900 (1995), the General Assembly adopted a revised Senate redistricting plan.  1995 Ga. Laws 6.  This Act included a description by Census tract and block of all 56 districts of the Georgia Senate.  *Id.*

9.

In 1997, after the Department of Justice denied preclearance to the 1995 and a Three-Judge Court had enjoined the use of the 1991 plan, the General Assembly adopted a statewide Senate redistricting plan.  *See Georgia v. Ashcroft*, 539 U.S. 461, 466-68 (2003)*; Johnson v. Miller,* 929 F. Supp. 1529 (S.D. Ga. 1996) (Three-Judge Court).  This Act included a description by Census tract and block of all 56 districts of the Georgia Senate.  *Id.*

10.

In 2001, the Georgia General Assembly adopted a statewide redistricting plan after receiving the results of the 2000 decennial Census.  2001 Ga. Laws 1st Ex. Sess. 2.  This Act included a description by Census tract and block of all 56 districts of the Georgia Senate.  *Id.*

11.

In 2002, after the decision in *Georgia v. Ashcroft,* 195 F. Supp. 2d 25 (D.D.C. 2002) (Three-Judge Court), which denied preclearance to the 2001 Senate plan, the General Assembly adopted an interim plan pending the appeal of that decision to the U.S. Supreme Court.  This Act included a description by Census tract and block of all 56 districts of the Georgia Senate.  *Id.*

Redistricting of the Georgia Senate – Less than Statewide Plans

12

During the 1970's, after the adoption of the 1971 statewide Senate plan, the General Assembly amended a portion of that plan twice. Each time the legislation contained only a description of the particular districts that were being amended and not a complete description of the statewide Senate plan. 1972 Ga. Laws 237 (Changes in Senate Districts 2, 5, 12, 15, 22, 32, 33, 35, 36, 37, 39, 42, 43, 44 and 56); 1974 Ga. Laws 1233 (Changes in Senate District 15).

13.

During the 1980's, after the adoption of the 1981 statewide Senate plan, the General Assembly amended of portion of that plan twice. Each time the legislation contained only a description of the particular districts that were being amended and not a complete description of the statewide Senate plan. 1982 Ga. Laws 444 (Changes in Senate Districts 5, 9, 22, 23, 42, 43, 48, 51, 54 and 55); 1988 Ga. Laws 1465 (Changes in Senate Districts 15 and 16).

14.

During the 1990's and in 2000 prior to the 2000 Census results, notwithstanding the adoption of the various statewide Senate plans, the General Assembly amended portions of the Senate plan four times. Each time the

legislation contained only a description of the particular districts that were being amended and not a complete description of the statewide Senate plan. 1993 Ga. Laws 863, 893 (Changes to Senate Districts 21, 32, 33, 37, 42, 48, 53, 54 and 56); 1994 Ga. Laws 174, 180 (Changes to Senate Districts 5, 10, 11, 13, 28, 29, 33, 37, 38, 41, 42, 43 and 55); 1999 Ga. Laws 42 (Changes in Senate Districts 1, 2, 34 and 44); 1998 Ga. Laws 21 (Changes to Senate Districts 3 and 6); 2000 Ga. Laws 1676 (Changes in Senate Districts 33 and 37).

<u>Senate Bill 386 – Plan Description</u>

15.

Senate Bill 386 (Act 435) was introduced in the Senate on January 9, 2006. S.B. 386 Legislative History, *available at* http://www.legis.state.ga.us/legis/2005_06/sum/sb386.htm.[1] The bill was adopted by the Senate on January 12 and ultimately approved by the House on January 31, 2006. *Id*. The Governor signed the bill into law on March 1, 2006. *Id.*

16.

Section One, Paragraph (a) (1), of the bill, states:

---

[1] The basic web page for the General Assembly is http://www.legis.state.ga.us/. By selecting "Legislation" and them inserting S.B. 386 in the search window, the history and text of the bill is available for review.

There shall be 56 members of the Senate. Each Senate district shall be composed of a portion of a county, or a county, or counties, or a combination thereof, and shall be represented by one Senator. The General Assembly recognizes that the apportionment of the senatorial districts for the 2004 elections was governed by the interim reapportionment plan entered by order of the United States District Court for the Northern District of Georgia in the case of Larios v. Cox, 314 F. Supp. 2d 1357 (N.D. Ga. 2004).

Joint Exhibit 6-B.

17.

Section One, Paragraph (a) (2) of the bill states:

Except as otherwise provided in this paragraph, the districts for Senate Districts 1 through 56 shall <u>continue</u> to be those districts as provided in the order of the United States District Court in the case of Larios v. Cox. On and after January 1, 2007, Senate Districts 46, 47, and 49 shall be as described in this paragraph and further identified as 'Plan Name: SFCamd47p2 Plan Type: Senate User: Blake Administrator: S047', which report is attached to the 2006 Act amending this Code section and is made a part of that Act and this paragraph.

Joint Exhibit 6-B.

18.

In describing the changes made by the Act, the bill further provides:

The first members of the Senate from Senate Districts 46, 47, and 49 elected pursuant to paragraph (2) of this subsection shall be those who are elected to take office

on the convening date of the regular session of the
General Assembly in 2007.  Until that time the members
of the Senate elected from Senate Districts 46, 47, and 49
under the interim court order in the case of Larios v. Cox
shall continue to serve and shall represent the districts
from which elected; and until that time the composition
of the districts from which such members were elected
shall remain the same.

*Id*.

## 19.

The attached plan description, physically describing the adopted plan as
referred to Paragraph (a)(2) includes a description of geography by Census tract
and block group only for Districts 46, 47 and 49 as the districts being amended.
There is no geographic description of an entire statewide plan.

*Id.*

## The Georgia Senate Plan – Litigation after the 2000 Census

## 20.

After the 2000 Census, the Georgia General Assembly enacted redistricting
plans for the Congress, the House of Representative and the Senate.  O.C.G.A.
§ 21-1-2, 2001 Ga. Laws. 2nd Ex. Sess. 335; O.C.G.A. § 28-2-1, 2001 Ga. Laws
2d Ex. Sess. 425; O.C.G.A. § 28-2-2, 2001 Ga. Laws 1st Ex. Sess. 2.  Stip. Fact
No. 7

21.

By declaratory judgment of the District Court for the District of Columbia, issued on April 6, 2002, the congressional and House plans were precleared under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, but preclearance of the Senate plan was denied. *Georgia v. Ashcroft*, 195 F. Supp.2d 25 (D.D.C. 2002), *vacated and remanded,* 539 U.S. 461 (2003). Stip. Fact No. 8.

22.

During the pendency of the appeal to the U.S. Supreme Court on the denial of preclearance to the Senate plan, the Georgia General Assembly adopted an interim Senate redistricting to be used pending the reversal of the District Court decision in *Georgia v. Ashcroft* and preclearance of the original Senate plan. 2002 Ga. Laws 148. Stip. Fact No. 9.

23.

The 2002 Senate plan was subsequently declared unconstitutional on February 10, 2004, by a three Judge panel of the Northern District of Georgia. *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.) (Three-Judge Court), *aff'd,* 542 U.S. 947 (2004). Stip. Fact No. 10.

24.

The *Larios* Court gave the General Assembly until March 1, 2004, to adopt a new reapportionment statute and the General Assembly failed to do so. *Larios v.*

*Cox,* 306 F. Supp. 2d 1212 (N.D. Ga. 2004) (Three-Judge Court).   Stip. Fact No. 11.

25.

The *Larios* Court then appointed former Eleventh Circuit Court of Appeals Judge Joseph W. Hatchett as a Special Master to create Legislative apportionment plans for the State of Georgia. *Id*.   Stip. Fact No. 12.

26.

The Special Master developed the plans and, after hearing argument from numerous interested parties regarding the specifics of the plan, on March 24, 2004, this Court entered an order adopting amended versions of the Special Master's plans.   The *Larios* Court concluded that the plans complied with one-person/one-vote requirements, the Voting Rights Act and traditional redistricting principles. *Larios v. Cox*, 314 F. Supp. 2d 1357, 1364 (N.D. 2004) (Three-Judge Court).   The Senate District plan created by order of this Court is hereinafter referred to as the "*Larios*" plan."   Stip. Fact No. 13.

27.

There was no substantive appeal to the *Larios* plan, which was then used for the 2004 elections for the Georgia Senate.   A copy of the map of the *Larios* plan has been submitted to the Court as Joint Exhibit 1-A.   Stip. Fact No. 14.

<u>The *Larios* Plan Deviation Statistics</u>

<u>28.</u>

While the "ideal" district size for a state senate district is 146,187, the population range for the court-drawn *Larios* plan is from 144,745 to 147,570. Joint Exh. 1-B.

29.

The "absolute" deviation range, i.e., the numbers of people below and above the ideal district size, for the *Larios* plan is a range from 1,442 below the ideal size to 1,383 persons above the ideal district size. *Id.* This is an absolute overall range of 2,825 persons. *Id.*

30.

The percentage deviation range of the *Larios* plan is -0.99% to 0.95%, or a relative overall range of 1.93%. *Id.*

31.

In providing guidelines for drawing the *Larios* plan, the Three-Judge Court stated:

> In performing the reapportionment task, a court must keep in mind that court-drawn plans are held to stricter standards than are legislative plans in terms of population equality and racial fairness. *Upham v. Seamon*, 456 U.S. 37, 39, 102 S.Ct. 1518, 1520, 71 L.Ed2d 725 (1982); *Wise,* 437 U.S. at 540, 98 S.Ct. at 2497; *Connor v. Finch*, 431 U.S. at 414, 97 S.Ct. at 1833. Moreover, the court's reapportionment "must be accomplished circumspectly,

> and in a manner 'free from any taint of arbitrariness or
> discrimination.'" *Connor v. Finch,* 431 U.S. at 415, 97
> S.Ct. at 1834 (quoting *Roman v. Sincock,* 377 U.S. 695,
> 710, 84 S.Ct. 1449, 1458, 12 L. Ed. 2d 620 (1964)).[2]

*Larios v. Cox*, 306 F. Supp. 2d 1214, 1216 (N.D. Ga. 2004) (Three-Judge Court).

32.

The *Larios* Court found that the statewide plan suggested by the Special

Master, including the statistics summarized above, met the strict standards for

deviation applied to a court-drawn plan. *Larios v. Cox*, 314 F. Supp. 2d 1357,

1364-65 (N.D. Ga. 2004) (Three-Judge Court.)

33.

Under the *Larios* plan, the deviation statistics for S.D.'s 46, 47 and 49 are:

| District Number | Total Population | Deviation | % Deviation |
|---|---|---|---|
| 46 | 145,476 | -711 | -0.49% |
| 47 | 147,129 | 942 | 0.64% |
| 49 | 146,916 | 729 | 0.50% |

Stip. Fact No. 39.

34.

Out of a total population of 439,521 assigned to these three districts under

the *Larios* plan, 1,136 persons have been affected or 0.258% of the population of

---

[2] *Wise v. Lipscomb*, 427 U.S. 535, 98 S. Ct. 2493 (1978); *Connor v. Finch*, 431
U.S. 407, 97 S.Ct. 1828 (1977).

these districts as a whole.

35.

In the *Larios* plan there are 19 Senate districts which have absolute and percentage range deviation greater than that of S.D. 46 under S.B. 386 (-1084 persons and -0.74%.)  They are Senate Districts 1, 2, 6, 8, 10, 15, 16, 19, 20, 22, 24, 27, 30, 31, 32, 33, 34, 37 and 41.   Joint Exh. 1-B.  There is one district that has the exact same deviation of S.D. 46 under the new S.B. 386 plan – S.D. 4.  *Id*.

36.

In the *Larios* plan there are 31 Senate districts which have absolute and percentage range deviation greater than that of S.D. 47 under S.B. 386 (747 persons and 0.51%.)  They are Senate Districts 1, 2, 3, 4, 5, 6, 7, 8, 10, 12, 13, 15, 16, 19, 20, 22, 24, 27, 30, 31, 32, 33, 34, 37, 41, 43, 47, 48, 51, 52, and 56.  Joint Exh. 1-B.

37.

In the *Larios* plan there are 6 Senate districts which have absolute and percentage range deviation greater than that of S.D. 49 under S.B. 386 (1297 persons and 0.89%.)  They are Senate Districts 2, 6, 10, 16, 20, and 27.  Joint Exh. 1-B.

38.

Under the *Larios* plan, the deviation statistics for S.D.'s 46, 47 and 49 are:

| District Number | Total Population | Deviation | % Deviation |
|---|---|---|---|
| 46 | 145,476 | -711 | -0.49% |
| 47 | 147,129 | 942 | 0.64% |
| 49 | 146,916 | 729 | 0.50% |

Stip. Fact No. 39.

<u>The S.B. 386 Plan Deviation Statistics</u>

39.

While the "ideal" district size for a state senate district is 146,187, the population range for the 2006 *Larios*-modified plan, including the S.B. 386 amendments, ranges from 144,745 to 147,570. Stip. Exh. J. This is unchanged from the *Larios* plan. *See* Joint Exh. 1-B.

40.

The "absolute" deviation range, i.e., the numbers of people below and above the ideal district size, for the 2006 *Larios*-modified plan, including the S.B. 386 amendments, is a range from 1,442 below the ideal size to 1,383 persons above the ideal district size. Stip. Exh. J. This is an absolute overall range of 2,825 persons. *Id.* This is unchanged from the *Larios* plan. *See* Joint Exh. 1-B.

41.

The percentage deviation range of the 2006 *Larios*-modified plan is -0.99% to 0.95%, or a relative overall range of 1.93%. Stip. Exh. J. This is unchanged

from the *Larios* plan.  *See* Joint Exh. 1-B.

42.

While not altering the plan of any of the remaining 53 Senate districts, the deviation statistics for the three affected districts under the S.B. 386 plan are:

| District Number | Total Population | Deviation | % Deviation |
|---|---|---|---|
| 46 | 145,103 | -1084 | -0.74% |
| 47 | 146,934 | 747 | 0.51% |
| 49 | 147,484 | 1,297 | 0.89% |

*See* Stip. Fact No. 41.

43.

Under the *Larios* plan, Plaintiff Kidd resides in S.D. 46.  Under the S.B. 386 plan, Ms. Kidd's residence remains in S.D. 46.  Stip. Fact No. 1.

44.

Comparing the population statistics for S.D. 46 under the *Larios* and S.B. 386 plans, S.D. 46 is an under-populated district, i.e., there are fewer people living in the district than the ideal district size of 146,187 persons, under both plans.

45.

Plaintiffs Suarez and Dr. and Ms. Blum reside in S.D. 46 under the *Larios* plan.  Stip. Fact No. 2, 3, 4.  Under the S.B. 386 plan, the residence of these three plaintiffs will be located in S.D. 47.  *Id*.

46.

Comparing the population statistics for S.D. 46 under the *Larios* plan and for S.D. 47 under the S.B. 386 plan, Plaintiffs Suarez, Dr. and Ms. Blum reside in a district that is overpopulated by 942 (0.64%) under the *Larios* plan, but this over-population will be reduced under the S.B. 386 plan because the new district is *less* overpopulated. It is overpopulated by 747 persons (0.51%).

<u>The drawing of the S.B. 386 Plan</u>

47.

On April 11, 2001, the Madison County Board of Commissioners passed a resolution asking that Madison County be kept whole during the General Assembly's consideration of redistricting after the 2000 Census. Hudgens Decl. ¶ 4 and attachment.

48.

Ralph Hudgens was elected to the Senate in 2002, after the adoption of new Senate plans following the 2000 Census, and following six years of service in the Georgia House of Representatives. Hudgens' Decl., ¶ 2. In the Senate, he then represented Senate District 47, which was composed of five whole counties and portions of 11 other counties. *Id*. One of the split counties included in this district was his "home county", Madison. *Id.;* Blake Ussery Aff. at ¶ 3.

49.

When the Senate plan under which he was elected was declared unconstitutional during the *Larios v. Cox* litigation, Senator Hudgens requested that the Court restore Madison County to be wholly contained within a single Senate district. *Id.* at ¶ 4. The Three-Judge Court did not adopt his suggestion. *Id*

50.

Senator Hudgens next raised the issue of restoring Madison County to a single Senate district in 2005, but the Senate leadership indicated that no changes to the state plans would be considered during that legislative session. *Id.* at ¶ 5. *See also* Eric Johnson Decl. at ¶ 4. Senator Johnson suggested that Senator Hudgens raise his request during the 2006 session. Hudgens Decl. at ¶ 5.

51.

By the fall of 2005, Senator Hudgens also knew that the Clarke County Chamber of Commerce had indicated an interest in increasing that county's representation in the state Senate. Hudgens Decl. at 7 and attachment; Johnson Decl. at ¶ 8, 9. Senator Brian Kemp, who represented Clarke County from District 46, sat on the Appropriations committee, but had announced that he was not going to seek re-election but instead run for election as the State Agriculture Commissioner. *Id*. at ¶ 7; Brian Kemp Aff. at ¶ 3; Stip. Fact No. 21. It was

unlikely that his replacement, as a freshman Senator, would be appointed to replace him on the Appropriations Committee. Johnson Decl. at ¶ 10(e); Hudgens Decl. at

52.

Clarke County's interest in increased representation in the Senate was not unusual. The county is the 14th largest county by population in the state and every single county larger than it, except for Hall County, was represented by more than one Senator. Johnson Decl. at ¶ 10(a). The two counties closest in size to Clarke also had more than one Senator representing them. *Id. See also* Hudgens Decl. at ¶ 9 and attachment.

53.

Clarke County, as home to the University of Georgia receives substantial state funding, as does the Clarke County public school system. Johnson Decl. at ¶ 10(c). *Id.* The county had a definite interest in having a voice that mattered in the legislative process. *Id;* Hudgens Decl. at ¶ 9, 10.

54.

On the other hand, Madison County's interests were very different. Madison County is much smaller, being only one-fourth the population of Clarke County. Johnson Decl. at ¶ 10(c). In the *Larios* plan, though, it had been combined a single district running from suburban Atlanta to Elbert County on the South Carolina

border.  Johnson Decl. at ¶ 10(c).  This district did not identify a community of interest.  *See Id.*

55.

Because of these interests, Senator Hudgens decided that in drawing his plan, not only would he focus on restoring Madison County wholly within a single Senate district, but also on providing additional representation for Clarke County. Hudgens Decl. at 10.

56.

During the fall of 2005, prior to the 2006 session, Senator Hudgens went to the Legislative and Congressional Reapportionment Office to draw a plan to put Madison County whole within a single Senate district.  Hudgens Decl. at 6; Blake Ussery Aff. at ¶ 3.

57.

Senator Hudgens' instructions for the drawing of the proposed plan were to restore Madison to be contained within a single senate District, remove Walton County (in the suburban Atlanta area) from the 47th and replace it with Oglethorpe and then use a portion of Clarke County to make up the balance of the population needed to meet the one-person/one-vote requirements in the same range as the *Larios* court had.  Ussery Aff. at ¶ 3.

58.

The swap of Walton for Oglethorpe County was also not unusual. The two counties were developing very differently because Loganville, in Walton County, was becoming a bedroom community for Atlanta. Hudgens Decl. at 13. Oglethorpe fit much better with the communities historically associated with the 47th Senate district, which was traditionally much more rural. Johnson Decl. at ¶ 8. Georgia Highway 72 runs along the border between Madison and Oglethorpe Counties, where a number of small cities sharing common mail routes and phone exchanges were located. Hudgens Decl. at 11. These communities were more bedroom communities for Athens and Clarke County and shared common needs for shopping, medical services and other community services in Clarke County. *Id*. at 11.

59.

Mr. Ussery made the determination as to which portion of Clarke County to assign to the new 47th Senate District. Ussery Aff. at ¶ 3. He chose that portion of Clarke County that had been a part of Senator Hudgens' district when he had served in the House of Representatives. *Id.* at ¶ 4. This was not an unusual choice either. The eastern portion of Clarke County was very similar in terms of population density and lifestyle with western Oglethorpe County. Hudgens Decl. at 15. Additionally, the City of Winterville, which is located in eastern Clarke

County, sits right on the border with Oglethorpe County, and again shares postal addresses and telephone exchanges with the neighboring county. Hudgens Decl. at 12.

60.

The combination of Oconee County, though, with Clarke County also was a good match. Hudgens Decl. at ¶ 13. They shared the Highway 78 corridor, a main link between Atlanta and Athens, and were experiencing similar growth issues with each other and their neighboring counties of Walton and Gwinnett. *Id.* at ¶ 13.

61.

Additionally, this plan was used to remove split precincts in Jackson County contained in the *Larios* plan. Ussery Aff. at ¶ 8. Where the splits could not be remedied, then the district was designed to follow I-85 as a visible geographic feature. *Id.;* Hudgens Decl. at 14.

62.

In drawing this plan, neither Mr. Ussery nor Senator Hudgens consulted what is known as "political performance data' in relation to the plan. Hudgens Decl. at 13; Ussery Aff. at ¶ 5. In fact, the "political performance data" for 2004 was not even available for review or comparison when the plan was developed. *Id.* In fact, neither Mr. Ussery nor Senator Hudgens relied on any political data in

drawing the plan he was to introduce. Hudgens Decl. at 18. No request was ever made to change any aspect of the plan on the basis of political performance. Ussery Aff. at ¶ 7.

<u>The 2006 Redistricting Process</u>

63.

Senator Eric Johnson, who serves as the President Pro Tem of the Senate, was first elected to the Senate in 1994. Johnson Decl. at 2. He served as the Minority Leader in the Senate from 1998 to 2002. *Id.*

64.

Senator Johnson had also been a plaintiff in the *Larios v. Cox* case, challenging the use or misuse of population in the redistricting process. Johnson Decl. at ¶ 3. Because of this and his strong belief that *Larios* was correctly decided, he is especially sensitive to this issue in redistricting. *Id.*

65.

Prior to the 2006 legislative session, having been approached by Senators interested in amending the *Larios* plans, Senator Johnson and other members of the Senate leadership, including Senator Chip Rogers who is the chairman of the Senate Reapportionment Committee, consulted on what guidelines should be given to Senators regarding potential redistricting plans. Johnson Decl. at ¶ 5; Chip Rogers Aff. at ¶ 6. All agreed that to basic guidelines and all Senators were

informed of them by letter.  Rogers Aff. at ¶ 6.  Senator Johnson also realized that the *Larios* plan was intended to be an interim plan and that the General Assembly could redraw the plan if it chose.  Johnson Decl. at ¶ 12.

66.

These guidelines included that all affected Senators agree to any changes, respecting a long-running Senate tradition of permitting "friendly swaps" of territory between adjacent districts.  Rogers Aff. at ¶ 6.  Additionally, all changes had to comply with the Voting Rights Act, constitutional principles including those espoused in *Larios*, while preserving communities of interest and avoiding bizarre shapes.  *Id*.  Population deviation was to be kept within the same range used by the *Larios* court.  *Id*.  All requests for changes also had to be submitted to Senator Rogers by January 20, 2006.  *Id*.  *See also* Johnson Decl. at ¶ 6.

67.

Senator Hudgens was the only Senator to present a proposed plan.  Johnson Decl. at ¶ 7.  It was introduced on the first day of the legislative session.  Rogers Aff. at ¶ 7; Stip. Fact No. 23.  That was Senate Bill 386.  Rogers Aff. at ¶ 7.  The other Senators affected by the plan supported its passage.  Rogers Aff. at ¶ 8; Kemp Aff. at ¶ 9; Casey Cagle Aff. at ¶ 9.  Senator Kemp understood that the addition of an additional Senate seat for Clarke County, which he had represented, would be an advantage for the county.  Kemp Aff. at ¶ 9.

68.

Senators Hudgens and Johnson discussed the plan and the beneficial aspects for both Madison and Clarke Counties. Johnson Decl. at ¶ 8. Additionally, given Senator Johnson's involvement in the *Larios* case, he too did not look at or discuss "political performance data" in relation to the proposed plan. *Id.* at ¶ 13.

69.

In drawing the proposed plan, Senator Hudgens acted to meet all of the criteria set by the Senate in presenting a plan. Hudgens Decl. at 17. Not only did all of the affected Senators agree to the plan, but he began working with the plan with the idea that the deviation should be as close to zero as possible. *Id.* The districts were contiguous, did not have any bizarre shapes and were more compact in shape than those under the *Larios* plan. *Id.* The plan recognized and restored communities of interest to better serve the people of those areas. *Id.*

70.

In drawing the plans, Senator Kemp did not consider the political ambitions or goals of Plaintiff Jane Kidd nor of her current opponent, Bill Cowsert (who is Senator Kemp's brother-in-law). Hudgens Decl. at ¶¶ 19, 20. He and Senator Kemp did not discuss Mr. Cowsert's candidacy, but did discuss that S.B. 386 would move Senator Kemp's residence into the 47th Senate District, potentially pitting the two incumbents against each other should Senator Kemp change his

mind about running for Agriculture Commission and wish to remain in the Senate. *Id.* at 20.

71.

Since the passage of S.B. 386, Senator Hudgens has received favorable comments from Clarke County officials and the leadership of the University of Georgia regarding the change. Hudgens Decl. at 21. If Senator Hudgens is re-elected, Clarke County will have retained the representation of a senior member of the Senate. *Id.* at ¶ 21; Johnson Decl. at ¶ 10(e).

The *FairMadison* Plan

72.

The *FairMadison* plan was raised as an alternative plan by Barbara Massey Reece, a Democratic Party member serving on the House Reapportionment Committee. Barbara Reece Decl. at ¶ 3, 4. She developed the plan as an alternative to Senator Hudgens' plan, focusing on keeping Madison County whole within S.D. 47. Reece Decl. at ¶ 5. However, her plan did not split Clarke County, but would remain entirely within S.D. 46. *Id.* at 6. One of her goals in drawing the plan was also preserve S.D. 46 as a politically competitive district for a Democratic Party candidate. *Id*. at ¶ 12.

73.

While returning Madison County whole to S.D. 46, the *FairMadison* plan

failed to meet Senator Hudgens' other announced criteria of increasing Senate representation for Clarke County. Hudgens Decl. at ¶ 7-10.

74.

As a matter of comity and tradition within the General Assembly, members of the House of Representatives will not normally offer amendments to a redistricting of the Senate plan. Kemp Aff. at ¶ 11, Cagle Aff. at ¶ 10, Rogers Aff. at 10.

75.

Representative Reece did not consult with Senators Rogers, Cagle or Kemp in relation to her offering of her alternative plan during the House Committee meeting. Kemp Aff. at ¶ 10, Cagle Aff. at ¶ 9, Rogers Aff. at ¶ 9. No one ever brought an alternative plan to Senator Johnson for consideration. Johnson Decl. at 14.

The Political Composition of the Georgia Senate

76.

Of the 56 Senators serving in the Georgia Senate, 21 identify themselves as members of the Democratic Party. Joint Exh. I.

# CONCLUSIONS OF LAW

1.

When a plaintiff seeks to enjoin a government agency such as the Secretary of State here, the plaintiff "must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own affairs." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976).

2.

With respect to claims alleging that a state statute violates the Fourteenth Amendment, as Plaintiffs claim here, there is a presumption that the State has acted constitutionally.

> Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. *State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality*. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*McGowan v. State of Maryland*, 366 U.S. 420, 425-26 (1961) (emphasis added).

3.

Further, in the context of redistricting, there is strong deference to state legislatures with respect to the devising of redistricting plans. The Supreme Court has stated repeatedly that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978). *Reynolds v. Sims*, 377 U.S. 533, 586 (1964); *Connor v. Finch,* 431 U.S. 407, 414-15 (1977); *Voinovich v. Quilter*, 507 U.S. 146, 156; *Growe v. Emison,* 507 U.S. 25, 34 (1993); *Upham v. Seamon,* 456 U.S. 37, 41 (1982); *Chapman v. Meier,* 420 U.S. 1, 27 (1975) ("We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.").

4.

For that reason, "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995).

5.

Because of that intrusion, a federal court may not "intervene in state apportionment matters in the absence of a violation of federal law." *Smith v. Cobb*

*County Bd. of Elections and Registrations*, 314 F.Supp.2d 1274, 1286 (N.D. Ga. 2002), citing *Voinovich,* 507 U.S. at 156.

6.

Plaintiffs claim two violations of federal law and a violation of state constitutional law.  For the reasons set forth below, the Court denies each of Plaintiffs' claims and enters judgment for Defendant.

Plaintiffs' One Person, One Vote Claim: Standing

7.

Defendants move to dismiss Plaintiffs' one person, one vote claim, asserting that Plaintiffs lack Article III standing.

8.

Plaintiffs bear the burden of proving that they have standing.  "Only those citizens able to allege injury as a direct result of having *personally* been denied equal treatment . . . may bring such a challenge, and citizens who do so carry the burden of proving their standing, as well as their case on the merits."  *United States v. Hays*, 515 U.S. 737, 746 (1995) (citation and internal punctuation omitted) (emphasis added).

9.

To establish Article III standing, Plaintiffs must meet three requirements, set forth in *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). The Plaintiffs must (1) have suffered an injury in fact or an invasion of a legally protected interest which is concrete and particularized; (2) demonstrate a causal connection between the injury and the challenged conduct; and (3) prove that it is likely that their asserted injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560-61; *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976); *National Parks Conservation Ass'n v. Norton,* 324 F.3d 1229, 1241 (11th Cir.2003); *Larios v. Perdue*, 306 F.Supp.2d 1190, 1209 (N.D. Ga. 2003).

10.

Plaintiff Kidd lives in an *underpopulated* Senate district. Therefore, she is, in fact, overrepresented:

> The analysis serving as the foundation for the one-person, one-vote or population equality principle is easily understandable. It suggests that a person living in a congressional district with a larger population than another district is "underrepresented." People living in a congressional district with a relatively smaller population are "overrepresented."

*Seamon v. Upham,* 536 F. Supp. 931, 942 (E.D. Tex. 1982), *vacated on other grounds*, *Upham v. Seamon*, 456 U.S. 37 (1982).

11.

In *Fairley v. Patterson*, 493 F.2d 598, 603-04 (5th Cir.1974) the former Fifth Circuit considered the issue of standing in one person, one vote cases and concluded that "injury results only to those persons domiciled in the under-represented voting districts." The *Larios* Court likewise held that "to possess standing to challenge on any grounds a legislative apportionment plan, a plaintiff must reside in an underrepresented district." *Larios,* 306 F. Supp. 2d at 1209.

12.

The injury at issue in a one person, one vote claim is "a discrete representational harm from the disproportionate weakness of [the underrepresented voter's] vote as compared to the vote possessed by a resident of an overrepresented district." *Larios v. Perdue*, 306 F.Supp.2d 1190, 1209 (N.D. Ga. 2003). As Plaintiff Kidd does not reside in an overpopulated – and thus underrepresented – district, she has no suffered no injury and has no standing to bring a one person, one vote claim. Her one person, one vote claim should therefore be dismissed.

13.

Plaintiffs Suarez and the Blum Plaintiffs likewise lack standing to bring a one person, one vote claim  Although they live in an overpopulated Senate district, under both the current and prior Senate plans, under the S.B. 386 plan, their Senate district is <u>less</u> overpopulated.

14.

As Plaintiff Suarez and the Blum Plaintiffs have more representation than under the current Senate plan, they can hardly have an interest in <u>less</u> representation by returning to a plan where they are worse off than under the S.B. 386 plan. They have no legal interest at stake in their one person, one vote claim. *See, e.g.*, *Smith v. Cobb County Bd. of Elections and Registrations*, 314 F.Supp.2d 1274, 1313(N.D. Ga. 2002) (denying intervention to those who lived in an underpopulated district on the ground that the intervenors had no legal interest at stake because "the intervenors' vote is stronger than it should be were there absolute population equality among the districts. That being so, putative intervenors have no interest in trying to press a claim that their vote is too strong.").

15.

Furthermore, if Plaintiffs succeeded on their claim, the only available remedy would be a requirement that the State use the prior Senate plan. In that event, Plaintiff Suarez and the Blum Plaintiffs would be placed into a more populated district and be less represented. Thus, those Plaintiffs cannot make the third showing required for standing: that it is likely that their asserted injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560-61; *Simon,* 426 U.S. at

41-42 (1976); *National Parks Conservation Ass'n,* 324 F.3d at 1241; *Larios*, 306 F.Supp.2d at 1209.

16.

As none of the Plaintiffs have standing to bring a one person, one vote claim, judgment is entered for the Defendant on that claim.

<u>Plaintiffs' One Person, One Vote Claim: Merits</u>

17.

The Fourteenth Amendment's Equal Protection Clause requires "substantially equal state legislative representation for all citizens." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964); *accord Bd. of Estimate v. Morris*, 489 U.S. 688, 694 (1989); *Brown v. Thompson*, 462 U.S. 835, 851 (1983); *Gaffney v. Cummings*, 412 U.S. 735, 743 (1973).

18.

States are required under the Equal Protection Clause to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds*, 377 U.S. at 577.

19.

Absolute population equality, however, is not necessary for proper state legislative apportionment, and "minor deviations from mathematical equality among state legislative districts are insufficient to make out a *prima facie* case of

invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Gaffney*, 412 U.S. at 745, 93 S.Ct. at 2321.

20.

A total population deviation less than 10% falls within this minor deviation category, *see Brown*, 462 U.S. at 842; *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993); *Connor v. Finch*, 431 U.S. 407, 418 (1977), and federal courts have concluded that minor deviations enjoy the presumption of constitutionality. *See Brown*, 462 U.S. at 842, *cited in Daly v. Hunt*, 93 F.3d 1212, 1218-22 (4th Cir. 1996); *Daly*, 93 F.3d at 1220-21 (presumption of constitutionality); *Larios v. Cox,* 300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd,* 542 U.S. 947, 124 S.Ct. 2806 (2004)(Three-Judge Court); *Cecere v. County of Nassau*, 274 F. Supp. 2d 308, 311 (E.D.N.Y. 2003) (presumption of constitutionality); *Montiel v. Davis*, 215 F. Supp. 2d 1279, 1286 (S.D. Ala. 2002) (Three-Judge Court) (presumption of constitutionality), *aff'd*, No. 02-12803, 2003 U.S. App. LEXIS 9051 (11th Cir. Feb., 21, 2003); *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 631 (D.S.C. 2002) (Three-Judge Court); *Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022, 1032 (D. Md. 1994) (Three-Judge Court) (presumption of constitutionality).

21.

Only "[a] plan with larger disparities in population [ ] creates a *prima facie* case of discrimination and therefore must be justified by the State" as the product of a rational and legitimate state policy. *Brown*, 462 U.S. at 842-43; *see Daly*, 93 F.3d at 1220-21.

22.

If the total deviation is less then 10%, "a *prima facie* - that is, rebuttable - presumption that the reapportionment plan in question *is* constitutional has been established.  The onus lies with plaintiffs to establish the unconstitutionality of the plan." *Larios v. Perdue*, 306 F.Supp.2d 1190, 1203 (N.D. Ga. 2003).

23.

Because the total population deviation of the 2006 Senate plan (whether judged from the total between the three districts or of the plan as a whole) is less than 10%, Plaintiffs bear the burden of  proving that no legitimate, consistently applied state policies justified such deviations.

24.

Legitimate state interests recognized by the Supreme Court in legislative redistricting are (1) maintaining political subdivisions, (2) maintaining the cores of existing districts, (3) protecting communities of interest, (4) providing for compact

districts, (5) drawing districts of contiguous territory and (6) protecting

incumbents. *See, e.g., Reynolds*, 377 U.S. at 578-79 (compactness, contiguity, and

preservation of counties and other political subdivisions); *Shaw v. Reno*, 509 U.S.

630, 647 (1993) (compactness, contiguity, and preservation of political

subdivisions); *Bush v. Vera*, 517 U.S. 952, 959-60, 963-64 (1996) (contiguity,

compactness, preservation of political subdivision, and incumbent protection).

25.

The legitimate state interests traditionally recognized in redistricting have

their basis in public policy considerations and courts' "recognition that

representative democracy cannot be achieved merely by assuring population

equality across districts." *Prosser v. Elections Bd.*, 793 F. Supp. 859, 863 (W.D.

Wis. 1992).

26.

Plaintiffs' burden is to prove that the population deviations are not supported

by legitimate state policies but underline are "tainted by arbitrariness or

discrimination." *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458

(1964); *Larios*, 300 F. Supp at 1337.

27.

The Supreme Court has consistently defined "arbitrary" as not related to a legitimate state goal. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (a "restriction or condition [that] is not reasonably related to a legitimate goal" is "arbitrary"); *Reed v. Reed*, 404 U.S. 71, 75-76 (1971) (legislation is "arbitrary" if it is not reasonable); *Katzenbach v. Morgan*, 384 U.S. 641, 662 (1966) (Harlan, J., dissent) (a classification is arbitrary if it "serves no legitimate state interest").

28.

An enactment is discriminatory if it is "divorced from any factual context from which we could discern a relationship to legitimate state interests" but instead is "undertaken for its own sake". *Romer v. Evans*, 517 U.S. 620, 635 (1996)

29.

The Plaintiffs have not met their burden of proving the negative, i.e., that no legitimate state policies support the population deviations in the challenged districts. The inquiry on a one person, one vote claim is whether the representational harm alleged – underrepresentation/overpopulation – resulted from arbitrariness and discrimination rather than from the application of legitimate state policies in the drawing of the plan. While Plaintiffs contend that the reasons for the changes were political, they fail to establish how the deviations were not

simply the result of the application of legitimate state interests in the drawing of the Senate plan.

30.

While the burden belongs to the Plaintiffs and Defendant need not justify the plan, Defendant has produced evidence that legitimate state interests were considered in the drawing of the plan, including preserving Madison County and instead to split the more populous Clarke County. The General Assembly further chose to make the dividing line in Barrow County follow the easily-recognizable boundary of I-85, to avoid split precincts and to make the districts more compact. All of these choices were recognized as legitimate considerations in the *Larios* decision, which was subsequently summarily affirmed by the United States Supreme Court. *Cox v. Larios*, 542 U.S. 947, 124 S.Ct. 2806 (2004).

31.

The law does not require the redistricting process to be free from politics to be deemed constitutional. *Larios v. Cox,* 300 F. Supp. 2d at 1354. "Politics and political considerations are, after all, 'inseparable from districting and apportionment.'" *Larios, 300* F. Supp. 2d at 1354, quoting *Gaffney,* 412 U.S. at 753, 93 S.Ct. at 2331.

32.

Thus, if the population deviations are supported by a legitimate state interest, courts do not invalidate the challenged plan "simply because political considerations played a role in its creation." *Larios, 300* F. Supp. 2d at 1354

33.

With respect to Plaintiffs' assertions regarding the *FairMadison* plan, the issue is whether the State engaged in an honest, good-faith effort to achieve population equality. *Reynolds*, 377 U.S. at 577. Simply because a plaintiff or a court can conceive of minor improvements does not mean the enacted plan was not a good-faith effort. *See Karcher*, 462 U.S. 725, 739 n.10 (1983) ("Nor do we indicate that a plan cannot represent a good-faith effort whenever a court can conceive of minor improvements.").

34.

Plaintiffs' *FairMadison* plan is one that they believe will result in more political success for a Democratic Senate candidate. There, however, is no constitutional guarantee of political success: "[A] group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme that makes winning elections more difficult, and a failure of proportional representation alone does not constitute impermissible discrimination under the Equal Protection Clause." *Davis v. Bandemer*, 478 U.S. 109, 132 (1986).

35.

Because the Plaintiffs have failed to establish that no legitimate state policies

support the deviations at issue and that instead, the deviations resulted from

arbitrary or discriminatory action on the part of the State, their one person, one

vote claim fails.

<u>Plaintiffs' Claims for Violation of Their Rights to Freedom of Speech, Association
and Petition and/or Political Gerrymandering Claim</u>

36.

Plaintiffs' second claim is that the a redistricting decision of the General

Assembly amounts to a "viewpoint discrimination" in violation of their First

Amendment rights to free speech, association and petition.  At its root, the

Plaintiffs' claim is that the challenged redistricting makes it harder for candidates

supported by Democratic voters to win in Senate District 46.

37.

Plaintiffs' claims are similar to those promoted by David Duke and his

supporters in the early 1990's, when the Republican Party refused to accept Mr.

Duke one of its candidates for President during the 1992 presidential preference

primary.  *See Duke v. Massey*, 87 F.3d 1226 (11th Cir. 1996). *See also Duke v.*

*Cleland, 783 F. Supp.* 600 (N.D.Ga.1992), *aff'd, Duke v. Cleland,* 954 F.2d 1526

(11th Cir.); *Duke v. Cleland*, 5 F.3d 1399 (11th Cir. 1993).   In rejecting the claims

by Duke and his supporters that the rejection of their political involvement
amounted to viewpoint discrimination and infringed on their rights to free speech
and association, the Eleventh Circuit noted:

> Although Duke is correct in identifying his First and
> Fourteenth Amendment interests, those interests do not
> trump the Republican Party's right to identify its
> membership based on political beliefs nor the state's
> interests in protecting the Republican Party's right to
> define itself. *Duke*, 954 F.2d at 1531. Therefore, the
> Committee, acting as representatives of the Republican
> Party under O.C.G.A. § 21-2-193 , did not heavily
> burden Duke's First Amendment and Fourteenth
> Amendment rights when it excluded him from the
> Republican Party's presidential primary ballot. . . .
>
> The voters, supporters of Duke, claim that O.C.G.A. §
> 21-2-193 burdens their associational rights and their right
> to vote for a candidate of their choice. The voters contend
> that under *Lubin v. Panish*, 415 U.S. 709, 94 S. Ct. 1315,
> 39 L. Ed. 2d 702 (1974), the right to vote is "heavily
> burdened" when the choices of candidates on primary
> ballots are restricted and other persons are "clamoring" to
> be listed on the election ballot. While *Lubin* does stand
> for the proposition that the voters urge, it also stands for
> the proposition that every voter cannot be assured that the
> voter's preferred candidate will be allowed on the ballot.
> *Lubin*, 415 U.S. at 716-17, 94 S. Ct. at 1320.

*Duke*, 87 F.3d at 1232-33.

38.

Like the candidate and voters in *Duke*, the Plaintiffs have the unfettered right
to participate in the political process, but there is no guarantee that they will

participate in a system that is favorable to their own political views.   In *Larios*, the

Plaintiffs made an identical claim.  In dismissing the claim, the court pointed out

the flaw on the plaintiffs' argument:  "It is well established that the 'First

Amendment protects political association as well as political expression.' *Buckley*

*v. Valeo*, 424 U.S. 1, 15 (1976).  However, it does not guarantee political success."

*Badham v. Wu*, 694 F. Supp. 664, 675 (N.D. Cal. 1988), *aff'd*, 488 U.S. 1024

(1989)." *Larios v. Cox*, Civ. Action File No. 1:03-cv-0693-CAP (Order of

December 17, 2003), Doc. 123, p. 8.

39.

Furthermore, "the power to influence the political process is not limited to

winning elections." *Davis*, 478 U.S. at 132.

40.

Plaintiff Kidd seeks to have a Senate District which she is more likely to

win.  Plaintiff Suarez and the Blum Plaintiffs seek to live in a district represented

by a Democratic senator.  The law, however, does not guarantee them that their

political desires will be met.  Therefore, Plaintiffs' claims for violation of their

First Amendment rights to freedom of speech, association and petition are denied.

41.

While Plaintiffs do not set out a claim for unconstitutional partisan gerrymandering, they reference gerrymandering in their complaint. To the extent that Plaintiffs are attempting to bring that claim, it fails as well.

42.

The burden of proof on a political gerrymandering claim is a difficult one. Plaintiffs must that there was intentional discrimination against an identifiable political group and that there was an actual discriminatory effect on that group, such that the group is "shut out" of the political process. *Davis*, 478 U.S at 127.

43.

The demonstration of an actual discriminatory effect requires a "two-prong showing: (1) of an actual or projected history of disproportionate results ; and (2) that 'the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process <u>as a whole</u>.'" *Terrazas v. Slagle*, 821 F. Supp. 1162, 1172 (W.D. Tex. 1993) (three judge court), quoting Davis, 478 U.S. at 132 (emphasis added).

44.

"The inquiry centers on the voters' direct or indirect influence on the elections of the state legislature *as a whole,*" so that an equal protection violation may be found only when "the electoral system substantially disadvantages certain

voters in their opportunity to influence the political process effectively." *Fund for Accurate and Informed Representation, Inc. v. Weprin,* 796 F. Supp. 662, 669 (N.D.N.Y. 1992), quoting *Davis*, 478 U.S. at 133 (emphasis added).

45.

Plaintiffs have not made any of the required showings. There is no showing that the Senate plan was an intentional discrimination against Democratic candidates or voters. In addition, the Plaintiffs have not shown that the three changes to the Senate plan, when considered in the context of the plan as a whole, will result in Democratic candidates and voters being shut out of the political process in Georgia. There is no showing of a history of discrimination against Democrats nor is there any evidence that the changes to the Senate plan will consistently degrade Democratic influence on the process as a whole. As noted above, influence on the process does not necessarily equate to winning elections.

46.

To the contrary, Democrats in Georgia are far from "shut out" of the political process. In statewide elected offices, Georgia currently has a Democratic Lieutenant Governor, Attorney General, Public Service Commissioner, Agriculture Commissioner. In the Congressional delegation, 6 of the 13 members (46%) are Democrats. Democrats constitute 43% of the State House and approximately 38% of the state Senate. *See Badham v. Eu*, 694 F. Supp. 664, 672 (N.D. Cal. 1988)

(three-judge court) (taking judicial notice in dismissal of political gerrymandering claim that California Republicans held the governorship, a U.S. Senate seat, and 40% of the Congressional seats), *appeal dismissed*, 488 U.S. 1024 (1988).

47.

Clearly, Georgia Democrats represent [a] potent a political force" such "that it is unnecessary for the judiciary to intervene . . . to protect the trampled rights of a disadvantaged political or racial minority."  *Badham*, 694 F. Supp. at 672.

48.

The burden to make out a political gerrymandering claim is heavy.  To the extent that Plaintiffs sought to bring such a claim here, it fails.

## Plaintiffs' State Constitutional Claim

49.

As their third and final claim, Plaintiffs assert the new and novel claim that the General Assembly exceeded its authority under the State Constitution by redistricting in 2006 because that action was not necessary.

50.

This state law claim has never been raised or decided in the Georgia courts.

51.

The State of Georgia is the real party in interest, and that the state constitutional claims constitute a cause of action against a state for violations of state law. Therefore, the Eleventh Amendment precludes the Court from considering Plaintiffs' state constitutional law claims. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99, 117-23 (1984); *DeKalb County Sch. Dist. v. Schrenko*, 109 F.3d 680, 687-88 (11th Cir. 1997); *Common Cause et al. v. Cox et al.*, Civ. Action File No. 4:05-CV-201-HLM (Oct. 18, 2006) (in considering a state constitutional law attack on Georgia's voter ID law, court concluded "the Eleventh Amendment precludes the Court from entertaining Plaintiffs' claims asserted under the Georgia Constitution.").

52.

Plaintiffs' claim that the General Assembly has no authority to redistrict itself as it deems appropriate is without merit in any event.   Plaintiffs are correct that the Georgia Constitution provides:

> The General Assembly shall apportion the Senate and House districts. Such districts shall be composed of contiguous territory. The apportionment of the Senate and of the House of Representatives shall be changed by the General Assembly as necessary after each United States decennial census.

Ga. Const. Art. III, Sec. II, Para. II.   However, this provision does not carry the restrictive meaning which the Plaintiffs promote.

53.

The provision provides first that the General Assembly has the power to apportion both the House and Senate. That power is unfettered in the state Constitution and, as noted above, the General Assembly has in the past freely engaged in multiple redistrictings, not merely those following a decennial Census. Certainly, the Georgia General Assembly is the best authority to determine that such actions are appropriate.

54.

The constitutional provision, however, does go on to specify that there is at least one circumstance that requires the General Assembly to address reapportionment. That is the conduct of a decennial Census. If the results of the Census demonstrate a need to adjust the reapportionment plans of the House, the Senate or the congressional district, then the Constitution mandates the legislature address that issue. This assures compliance with the one-person/one-vote principles espoused by the Plaintiffs and recognized in *Baker v. Carr*, 369 U.s. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964).

55.

There is nothing in the context of this constitutional provision or in the history of Georgia which would indicate that this provision assuring a re-examination of reapportionment plans after a decennial Census is conversely also a

restriction on any other powers provided to the General Assembly.  This argument, therefore, fails.

56.

For these reasons, the Court should declare that the Senate plan is valid and declines to enjoin its use.  Judgment should be entered in favor of Defendant.

This 2nd day of May, 2006.

Respectfully submitted,

THURBERT E. BAKER
Attorney General of the State of Georgia
Georgia Bar No. 033887

/s/ Dennis R. Dunn
DENNIS R. DUNN
Deputy Attorney General
Georgia Bar No. 234098

State Law Department
132 State Judicial Building
40 Capitol Square, S.W
Atlanta, GA  30334-1300
Telephone (404) 656-5614
Facsimile (404) 657-9932

/s/ Anne W. Lewis
ANNE W. LEWIS
Special Assistant Attorney General
Georgia Bar No. 737490

STRICKLAND BROCKINGTON LEWIS LLP
Midtown Proscenium, Suite 2000
1170 Peachtree Street, N.E.
Atlanta, GA  30309
Telephone: 678/347-2200
Facsimile: 678-347-2210
awl@sbllaw.net

## **Local Rule 7.1D Certification**

By signature below, counsel certifies that the foregoing document was

prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1B.

/s/ Dennis R. Dunn
DENNIS R. DUNN

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day electronically filed the within and

foregoing **DEFENDANT'S PROPOSED FINDINGS OF FACT AND**

**CONCLUSIONS OF LAW** with the Clerk of Court using the CM/ECF system,

which will send notification of such filing to all parties to this matter via electronic

notification or otherwise:

> Emmet J. Bondurant, Esq.
> David G.H. Brackett
> Jason J. Carter
> Bondurant, Mixson & Elmore, LLP
> 3900 One Atlantic Center
> 1201 West Peachtree Street
> Atlanta, GA 30309

This 2nd day of May, 2006.

> /s/ Dennis R. Dunn
> DENNIS R. DUNN
> Deputy Attorney General
> Georgia Bar No. 234098

Department of Law
State of Georgia
40 Capitol Square, S.W.
Atlanta, GA  30334-1300
Telephone: 404/656-7298
Facsimile: 404/657-9932