IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MS. JANE KIDD, ANDREA
SUAREZ, DR. MURRAY BLUM,
AND ANN BLUM,

        Plaintiffs,

v.

CATHY COX, Individually and in her
Official Capacities as Secretary of
State of Georgia and Chair of the
Georgia Elections Board,

        Defendant.

CIVIL ACTION NO.
1:06-CV-0997-BBM
(Three-Judge Court)

## MEMORANDUM OPINION

Before BLACK, Circuit Judge, EVANS, Chief District Judge, and MARTIN, District
Judge.

BY THE COURT:

      This case was brought to challenge the redistricting of Georgia Senate Districts

46, 47, and 49, as set forth in Senate Bill 386 ("S.B. 386") and signed into law by

Governor Sonny Perdue on February 28, 2006. Plaintiffs are voters from the Athens-

Clarke County, Georgia area affected by S.B. 386. Additionally, Plaintiff Jane Kidd

("Ms. Kidd"), is a member of the Georgia General Assembly who has qualified to run

for the Democratic Party nomination in Georgia Senate District 46.

In their Complaint, Plaintiffs assert that S.B. 386 violates a number of federal and state constitutional provisions as well as certain federal statutes. Specifically, Plaintiffs claim that S.B. 386: (1) violates the one person, one vote principle guaranteed under the Equal Protection Clause of the Fourteenth Amendment; (2) is a partisan gerrymander in violation of the Equal Protection Clause (raised in argument but not in the Complaint); (3) is a partisan gerrymander in violation of Constitutional guarantees of freedom of speech, association, and petition; and (4) violates Article III, section 2, paragraph 2 of the Georgia Constitution, which empowers the Georgia General Assembly to apportion the state Senate and House Districts.

## I. BACKGROUND

A.   *History of Georgia's Redistricting Since the 2000 Decennial Census*

The issues raised by this case grow out of the report of the 2000 Decennial Census. Georgia had experienced substantial population growth over the prior decade and was entitled to two additional Congressional seats as a result. That population growth was accompanied by population shifts, which also gave rise to disparities in the number of voters allotted to existing state legislative districts. Accordingly, in 2001 the Georgia General Assembly enacted legislation reapportioning Congressional as well as legislative districts for the Georgia House

and Senate. In a subsequent declaratory judgment action, the United States District Court for the District of Columbia precleared the Congressional redistricting plan (the "Congressional Plan") as well as the state House redistricting plan (the "House Plan") under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, but denied preclearance to the Senate plan (the "2001 Senate Plan").[1] *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 97 (D.D.C. 2002) (three-judge court), *vacated and remanded*, 539 U.S. 461, 123 S. Ct. 2498 (2003). During the pendency of the appeal to the United States Supreme Court on the denial of preclearance to the 2001 Senate Plan, the General Assembly enacted an interim Senate redistricting bill (the "2002 Senate Plan"), which was signed into law on April 11, 2002. The District Court for the District of Columbia precleared the 2002 Senate Plan on June 3, 2002.

A three-judge court of the Northern District of Georgia, however, subsequently declared the 2002 Senate Plan and the House Plan unconstitutional. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga.) (three-judge court), *aff'd*, 542 U.S. 947, 124 S. Ct. 2806 (2004). The *Larios* Court gave the General Assembly until March 1, 2004, to adopt a new reapportionment statute, but the General Assembly failed to do so. The *Larios* Court then appointed a Special Master to create legislative

---

[1] Georgia is a jurisdiction covered by Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, and is therefore required to have its reapportionment plans precleared by the federal government.

3

apportionment plans, *Larios v. Cox*, 306 F. Supp. 2d 1212 (N.D. Ga. 2004) (three-judge court), and on March 25, 2004, entered an Order adopting amended versions of the Special Master's plans. The Senate redistricting plan thereby adopted is hereinafter referred to as the "*Larios* Plan."

B.    *The Larios Plan and Subsequent Developments*

Under the *Larios* Plan, Senate District 46 encompassed all of Athens-Clarke, Oconee, and Oglethorpe Counties and a portion of Madison County. Senate District 47, which bordered Senate District 46, encompassed all of Barrow County and portions of Elbert, Jackson, Madison, and Walton Counties. Senate District 49, on the other hand, encompassed all of Hall and part of Jackson County.

Athens-Clarke County is unique among its neighboring counties. The University of Georgia, the state's flagship university, is located within the county, in Athens. With 101,489 residents as of the 2000 Census, Athens-Clarke County is by far the largest metropolitan area in Senate Districts 46 and 47. While Athens-Clarke County is the smallest county in all of Georgia in terms of square miles, it is also the fourteenth largest county in the State by population.

By the fall of 2005, at least one constituency within Athens-Clarke County was seeking increased political representation at the state level. Specifically, the Athens-Clarke County Chamber of Commerce included among its 2006 legislative priorities

4

"any redistricting efforts to increase our representation at the State Capitol, as one of the largest and most educated regions in Georgia." (Hudgens Decl., Ex. 3.)

By contrast, even before the *Larios* Plan, certain constituencies within Madison County, which borders Athens-Clarke County to the north and east and has a population of only 25,730 people, wanted the county to be encompassed within a single Senate District.[2]  On April 11, 2001, the Madison County Commission executed a resolution requesting that Madison County be placed in a single Senate District, with the remainder of the district consisting of counties of similar character and interest. Similarly, on March 3, 2004, the Madison Chamber of Commerce wrote to Governor Perdue requesting that the county be placed within a single Senate District. During the *Larios* litigation, Georgia Senator Ralph Hudgens, whose home county is Madison, requested that the Court's redistricting plan place the county in a single Senate District. The Court did not adopt his suggestion.

The *Larios* Plan, which was not appealed, was used for the 2004 Georgia Senate elections. Republican incumbents won lopsided victories in Senate Districts 47 and 49: Senator Hudgens won District 47 with 71.1% of the vote, while Senator Casey Cagle, who was unopposed, won District 49 with 100% of the vote. By

_____

[2]Of the 31 Georgia counties in the 20,000 to 30,000 population range, approximately 80% of them are wholly contained within a single Senate District.

5

contrast, the race was considerably tighter in District 46, where Senator Brian Kemp, the Republican incumbent, received 29,422 votes (51.6%) to Democrat Becky Vaughn's 27,617 votes (48.4%).[3]  Meanwhile, in the 2004 race for House District 115, which lies in Senate District 46, Ms. Kidd defeated Bill Cowsert, who is Senator Kemp's brother-in-law, with 56% of the vote to his 44% of the vote.[4]

C.    *Senate Bill 386*

On January 9, 2006, Senator Hudgens introduced S.B. 386 to the Senate Reapportionment Committee. By its own terms, S.B. 386 expressly maintains those Senate Districts set forth under the *Larios* Plan but for three exceptions. Specifically, S.B. 386 alters Senate Districts 46, 47, and 49 by: (1) moving a precinct of Madison County from Senate District 46 to Senate District 47, thereby wholly containing Madison County within Senate District 47; (2) moving six-and-one-half precincts in the eastern half of Athens-Clarke County, which previously had been entirely within Senate District 46, to District 47; (3) moving Oglethorpe County from Senate District 46 to Senate District 47; (4) moving portions of Walton County that had been in

---

[3]In the 2004 Presidential race, President Bush won 58% of the state's vote to Senator John Kerry's 41.4% of the vote. Conversely, in Athens-Clarke County, Senator Kerry won 58.3% of the vote to President Bush's 40.4% of the vote.

[4]Bill Cowsert has now qualified to run for the Georgia State Senate in District 46.

6

Senate District 47 into Senate District 46; and (5) making certain changes to the border between Senate Districts 47 and 49.

S.B. 386 was passed by the Senate Reapportionment Committee with a "Do Pass" recommendation, and the Senate subsequently adopted the bill by a straight party-line vote of 34 to 22. Every Republican voted for the bill, while every Democrat voted against it. Notably, the Senators of Districts 46, 47, and 49 all voted for S.B. 386. When S.B. 386 reached the House Reapportionment Committee, a Democratic member of the committee, Barbara Massey Reece, proposed the "Fair Madison Plan." The Fair Madison Plan altered the *Larios* Plan in only two respects: (1) the one Madison County precinct in District 46 moved to District 47, thus making Madison County whole; and (2) the three precincts in Elbert County that had been in District 47 moved to District 46. The Reapportionment Committee, however, rejected the Fair Madison Plan by a hand vote that fell exactly along partisan lines within two minutes of the plan's proposal.[5]

S.B. 386 passed out of the House Reapportionment Committee with a "Do Pass" recommendation and was subsequently adopted in the House of

------------------------------

[5]At the May 2, 2006, trial of this case, Defendant claimed that it is a custom in the House not to intervene in Senate redistricting plans. Defendant also acknowledged, however, that the consideration in the House of Senate redistricting plans that did not originate in the Senate is not unprecedented.

7

Representatives without a single dissenting Republican vote. All but four of the eighty-three Democrats in the House voted against the bill. Three of those four Democrats have changed party affiliation and are now members of the Republican Party. After Governor Perdue signed S.B. 386 into law on February 28, 2006, the United States Justice Department precleared S.B. 386 on April 20, 2006.

S.B. 386 received attention in the local press. On January 19, 2006, the *Oconee Enterprise* reported:

> A bill passed in the Georgia Senate last week could give Oconee County a stronger voice in state affairs by dividing Athens, a Democratic stronghold, into two districts.
>
> That's according to Sen. Brian Kemp, who said part of the district which includes Oconee, the 46th, would be chopped off, giving Oconee a higher percentage of the voting population.

(Pl.'s Mem. in Supp. of Mot. for Prelim. Inj., Ex. E.)

Similarly, on March 8, 2006, the online *MainStreetNews*, which covers news for a number of counties in northeast Georgia, reported that Senator Hudgens had said at a January Madison County Republican Party meeting: "It was confusing to have some people . . . in one district and some in another. . . . If you look at the people who are against this plan, they're against it because it's bad for the Democratic Party. Yet, they accuse me of being partisan." (*Id.*, Ex. D.)

8

D.   *Procedural History of this Case*

Plaintiffs filed their Complaint in this action on April 25, 2006, asserting that the change to Senate District 46 under S.B. 386 has made that district less competitive for Democratic candidates. A three-judge court was convened pursuant to 28 U.S.C. § 2284(a). By Order of April 26, 2006, we extended the deadline for candidates to qualify to run for Senate Districts 46, 47, and 49 as well as for the corresponding Georgia House Districts. The trial of the case was conducted on May 2, 2006. During the trial, Plaintiffs abandoned their claim that S.B. 386 violates Article III, section 2, paragraph 2 of the Georgia Constitution, insofar as it was asserted as an independent basis for invalidating the redistricting plan. Later that same day, we issued an Order finding the Defendant is entitled to prevail in the action. We will first discuss some threshold issues, then set forth the basis upon which we decided that Defendant is entitled to prevail.

## II. THRESHOLD ISSUES

A.   *The Propriety of a Three-Judge Court*

We deal at the outset with a challenge to our jurisdiction under 28 U.S.C. § 2284(a). Defendant asserts that § 2284(a) only allows for the convening of a three-judge court where the subject matter of the case is a statewide redistricting plan—that is, a plan apportioning each and every one of the relevant legislative

districts in the state. Defendant goes on to claim that Plaintiffs' challenge to S.B. 386, which reapportions only three Senate Districts, does not trigger jurisdiction pursuant to § 2284(a).

In pertinent part, § 2284(a) requires that a three-judge court be convened "when an action is filed challenging the constitutionality of . . . the apportionment of any statewide legislative body." The plain language of the statute applies to "the apportionment of any statewide legislative *body*" and says nothing to indicate that jurisdiction must be premised on a statewide *apportionment*. Here, S.B. 386 indisputably apportions a statewide legislative body, the Georgia Senate.

Furthermore, the cases on which Defendant relies are inapposite. For example, in *White v. Regester*, 412 U.S. 755, 760, 93 S. Ct. 2332, 2336 (1973), the Supreme Court described as "frivolous" the defendant's challenge to the jurisdiction of a three-judge court that had declared a state legislative reapportionment plan invalid but had only enjoined the plan with respect to its implementation in two counties. The relevance of *White* to Defendant's claim that this court lacks jurisdiction is not immediately clear. If anything, *White* bolsters the position that the Court's jurisdiction is proper, and that it may grant relief on less than a state-wide basis. In the remaining cases Defendant has cited, a single-judge district court exercised jurisdiction over challenges to the redistricting of a particular county's electoral

subdivisions. The courts in these cases made no mention of the propriety of a three-judge court's jurisdiction under § 2284(a) with respect to the apportionment of a statewide legislative body. *See Smith v. Cobb County Bd. of Elections & Registration*, 314 F. Supp. 2d 1274 (N.D. Ga. 2002) (Cobb County Board of Education and Cobb County Commission electoral districts); *Bodker v. Taylor*, No. 1:02-CV-999-ODE, 2002 U.S. Dist. LEXIS 27447 (N.D. Ga. June 5, 2002) (Fulton County Board of Commissioners electoral districts); *Markham v. Fulton County Bd. of Elections & Registrations*, No. 1:02-CV-1111-WBH, 2002 U.S. Dist. LEXIS 27505 (N.D. Ga. May 29, 2002) (Fulton County Board of Education electoral districts). This being the case, the Court considers these cases to be irrelevant to the issue of our jurisdiction. Finally, we note that were Defendant's argument that we lack jurisdiction found to be meritorious, states could avoid the jurisdiction of a three-judge court simply by amending their redistricting plans piecemeal. Plainly, this is not the result intended by the statute. We are thus persuaded that we have jurisdiction over this case under § 2284(a).

B.    *Standing of the Plaintiffs*

We will also address at the outset the challenge to whether Plaintiffs have standing to bring this lawsuit in the first instance. During the May 2, 2006, trial of

11

this case, counsel for Defendant argued Plaintiffs have suffered no injury. This is a conclusion we find to be contradicted by the evidence.

The applicable principles with respect to standing are well settled. Specifically, to have standing, and thus a justiciable "case or controversy" under Article III of the United States Constitution, Plaintiffs must establish that: "(1) they have suffered a particularized, concrete injury to a legally protected interest (injury in fact); (2) the injury is fairly traceable to the challenged action (causation); and (3) it is likely that the injury may be redressed by judicial action (redressability)." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005); *see also Bennett v. Spear*, 520 U.S. 154, 162, 117 S. Ct. 1154, 1161 (1997). Here, it is undisputed that Andrea Suarez, Dr. Murray Blum, and Ann Blum resided in Senate District 46 under the *Larios* Plan, but now reside in Senate District 47 under S.B. 386. The import of this change is that while Ms. Suarez, Dr. Blum, and Ms. Blum resided in a district that was underpopulated under the *Larios* Plan, they now reside in a district that is overpopulated under S.B. 386, effectively diluting their vote and purportedly discriminating against them in violation of their Constitutional rights to equal protection as well as freedom of speech, association, and petition. It has been recognized that "[a] plaintiff need not have the franchise wholly denied to suffer injury." *Charles H. Wesley Educ. Found., Inc.*, 408 F.3d at 1352. Rather, "[a]ny

12

concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." *Id.* Based on the foregoing, we are satisfied Plaintiffs have met their burden here. Having concluded that Ms. Suarez, Dr. Blum, and Ms. Blum have standing, we are not required to decide whether Ms. Kidd does as well. *See Am. Civil Liberties Union of Ga. v. Rabun County Chamber of Commerce*, 698 F.2d 1098, 1108-09 (11th Cir. 1982) ("Because we have determined that at least these two individuals have met the requirements of Article III, it is unnecessary for us to consider the standing of the other plaintiffs in this action."); *accord Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160, 102 S. Ct. 205, 212 (1981).

## III. DISCUSSION

We now explain why Defendant is entitled to prevail in this case. We first address Plaintiffs' one person, one vote claim under the Equal Protection Clause of the Fourteenth Amendment, and then move to Plaintiffs' political gerrymandering claims under the Equal Protection Clause and the First Amendment.

A.   *Equal Protection: One Person, One Vote*

1.   *One Person, One Vote Standards*

The Supreme Court long ago recognized that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are

13

illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 535 (1964). The Equal Protection Clause guarantee known as the one person, one vote principle, requires each state to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S. Ct. 1362, 1390 (1964).

A strict standard requiring absolute mathematical equality among state legislative districts is not, however, constitutionally required. *Brown v. Thomson*, 462 U.S. 835, 842, 103 S. Ct. 2690, 2696 (1983). Rather, the Supreme Court has directed: "So long as the divergences . . . are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature." *Reynolds*, 377 U.S. at 579, 84 S. Ct. at 1391. "Any number of . . . legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Karcher v. Daggett*, 462 U.S. 725, 740, 103 S. Ct. 2653, 2663 (1983). In assessing the legitimacy of any such legislative policy, we must consider "[t]he consistency of

14

application and the neutrality of effect of the nonpopulation criteria . . . along with the size of the population disparities." *Brown*, 462 U.S. at 845-46, 103 S. Ct. at 2697-98. Fundamentally, however, these policies must be "free from any taint of arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. 695, 710, 84 S. Ct. 1449, 1458 (1964).

The Supreme Court has adopted a so-called "ten-percent rule" for allocating the burden of proof in one person, one vote cases. "[A]s a general matter, . . . an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State." *Brown*, 462 U.S. at 842-43, 103 S. Ct. at 2696 (citations omitted). In other words, population deviations of less than ten percent "are presumptively constitutional, and the burden lies on the plaintiffs to rebut the presumption." *Larios*, 300 F. Supp. 2d at 1341; *see Cox v. Larios*, 542 U.S. 947, 949, 124 S. Ct. 2806, 2808 (2004) (rejecting appellant's invitation to create a "safe harbor" for population deviations of less than ten percent).

The ideal population for each Senate District in Georgia equals the total population of the state divided by the number of Senate Districts. Based on the 2000 Census, Georgia's population was 8,186,453 persons. Since there are 56 Senate

15

seats, the ideal population for each Senate District in Georgia is 146,187 people.
Under the *Larios* Plan, Senate Districts 46, 47, and 49 deviated from the ideal as
follows:

| District Number | Total Population | Deviation | % Deviation |
|---|---|---|---|
| 46 | 145,476 | -711 | -0.49 |
| 47 | 147,129 | 942 | 0.64 |
| 49 | 146,916 | 729 | 0.50 |

Under the *Larios* Plan, the difference in population between the largest and smallest
of the three Senate Districts (the "absolute overall range") was 1,653 people. The
total percentage deviation from the ideal district, which equals the absolute overall
range divided by the population of the ideal district, was 1.13%. Furthermore, across
all 56 Senate Districts, the *Larios* Plan had a total population deviation of 1.93%.
*Larios v. Cox*, 314 F. Supp. 2d 1357, 1364 (N.D. Ga. 2004) (three-judge court).

S.B. 386 has altered these calculations. Senate Districts 46, 47, and 49 now
deviate from the ideal as follows:

| District Number | Total Population | Deviation | % Deviation |
|---|---|---|---|
| 46 | 145,103 | -1084 | -0.74 |
| 47 | 146,934 | 747 | 0.51 |
| 49 | 147,484 | 1,297 | 0.89 |

16

Under S.B. 386, the absolute overall range between the largest and smallest of the three Senate Districts is 2,381 people, and the total percentage deviation from the ideal district is 1.63%.

Neither the parties nor the Court has identified a case considering the issue of whether the total percentage deviation of a subset of the electoral districts of a statewide body—in this case, a subset consisting of three Senate Districts—is subject to the ten-percent rule. Indeed, neither party has addressed this issue. We have already noted, "[a]ny number of . . . legislative policies might justify some variance." *Karcher*, 462 U.S. at 740, 103 S. Ct. at 2663. Lacking empirical evidence of malapportionment, the court must search for these policies in the legislative history, which, as the Supreme Court has recognized in a different context, "is itself often murky, ambiguous, and contradictory." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, __ U.S. __, __, 125 S. Ct. 2611, 2626 (2005). As the total percentage deviation approaches zero, the search becomes more difficult because laws promulgated by legislatures "can be inconsistent, illogical, and ad hoc," whereas judicial decisions must be "principled, rational, and based upon reasoned distinctions." *See Vieth v. Jubelirer*, 541 U.S. 267, 278, 124 S. Ct. 1769, 1777 (2004) (plurality opinion). Furthermore, as the Supreme Court has repeatedly advised, caution is the *sine qua non* of judicial scrutiny of districting legislation. Districting is "the most vital of local

17

functions" and "primarily the duty and responsibility of the state." *Miller v. Johnson*,
515 U.S. 900, 915, 115 S. Ct. 2475, 2488 (1995); *see Wise v. Lipscomb*, 437 U.S.
535, 539, 98 S. Ct. 2493, 2497 (1978) ("[R]edistricting and reapportioning legislative
bodies is a legislative task which the federal courts should make every effort not to
pre-empt."). As these principles all counsel in favor of applying the ten-percent rule
here, we will do so.

The total percentage deviation across Districts 46, 47, and 49 increased under
S.B. 386. That deviation, however, is still well within the total percentage deviation
of the *Larios* Plan, which was developed pursuant to "certain traditional and neutral
principles of redistricting." *Larios*, 314 F. Supp. 2d at 1360. Furthermore, the total
percentage deviation under S.B. 386 is, at 1.63%, well below the ten-percent
deviation that would, under the Supreme Court's holding in *Brown*, automatically
shift the burden to the state to justify its reapportionment scheme. We thus find that
Plaintiffs bear the burden in this case.

We must determine, then, what exactly the Plaintiffs have the burden of
showing. Neither party has addressed the issue of whether we must consider S.B. 386
strictly on its own terms, or whether we should consider S.B. 386 as but one part of
the larger Senate Districting plan. We have not identified precedent precisely on
point. Rather, the Supreme Court merely directs that we consider "the plan as a

18

whole." *Karcher*, 462 U.S. at 741, 103 S. Ct. at 2664. Additionally, as we have already noted, the Supreme Court has strongly cautioned against the federal courts' intrusion in state redistricting decisions, especially ones that do not implicate the apportionment of federal congressional districts. *Brown*, 462 U.S. at 851 n.1, 103 S. Ct. at 2701 n.1 (Brennan, J., dissenting) (citing *Mahan v. Howell*, 410 U.S. 315, 320-25, 93 S. Ct. 979, 983-85 (1973)). Against this background we conclude that Plaintiffs must show that S.B. 386, considered in light of Georgia's statewide Senate Districting plan, reflects the General Assembly's failure to "make an honest and good faith effort to construct districts . . . as nearly of equal population as practicable." *Reynolds*, 377 U.S. at 577, 84 S. Ct. at 1390. That is to say, the Plaintiffs must show that the *de minimis* deviations in this case are unrelated to any legitimate redistricting criterion and are therefore tainted by arbitrariness or discrimination. *See Roman*, 377 U.S. at 710, 84 S. Ct. at 1458.

## 2.    *Legitimate State Interests*

Both parties have given the Court some indication as to what the state's legitimate interests with respect to redistricting are. Specifically, in their Joint Stipulation of Facts, the parties state: "In reapportionments, Georgia has had a 'strong historical preference . . . for not splitting counties outside the Atlanta Area, and not splitting precincts, maintenance of core districts, and recognition of

19

communities of interest.' [*Larios*,] 300 F. Supp. 2d at 1349 (*quoting Abrams v. Johnson*, 521 U.S. 74, 99-100 (1997))." (Joint Stip. of Fact ¶ 49.) As neither party has challenged these interests, we assume that they are just as vital now as when *Larios* was handed down two years ago.

Plaintiffs assert that S.B. 386 may not be justified by any of the foregoing legitimate state interests. Defendant disagrees and goes on to argue that S.B. 386 serves the additional legitimate state interests of: (1) keeping less-populated counties within a single Senate District; (2) according counties with larger populations, such as Athens-Clarke County, more than one Senator; (3) recognizing communities with common economic and geographic interests; and (4) ensuring that, on the retirement of Senator Kemp and the election of a freshman Senator in District 46, Senator Hudgens, who has the more prestigious or authoritative committee assignments that come with years of service, would represent a part of Athens-Clarke County—that part in District 47.

In determining whether S.B. 386 violates the one person, one vote principle, then, we will consider whether Plaintiffs have demonstrated that the *de minimis* deviation from the one person, one vote standard here may *not* be explained by Georgia's legitimate interests. In so doing, the Court remains mindful of Supreme Court precedent on this question. Legitimate state interests must be assessed with

20

reference to a "flexible" standard, one that accounts for "the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely." *Karcher*, 462 U.S. at 741, 103 S. Ct. at 2664; *see Brown*, 462 U.S. at 845-46, 103 S. Ct. at 2697-98. Our analysis is not fixed to "numerical standards which excuse population variances without regard to the circumstances of each particular case." *Karcher*, 462 U.S. at 731, 103 S. Ct. at 2658 (quotation omitted).

Plaintiffs' first claim—that S.B. 386 is not consistent with the state's legitimate interest in not dividing whole counties outside the Atlanta Area and splitting precincts because it places Athens-Clarke in two Senate Districts—has some merit. Under the *Larios* Plan, the twenty most populous counties in the state participate in the election of fifty-five of the State's fifty-six senators. Of these counties, eleven are located in or around Atlanta and are contiguous—that is, each such county shares a border with at least one other county that is also one of the top twenty most populous counties.[6] Of the nine remaining counties in the top twenty, five participated in the

---

[6]These counties are Hall, Forsyth, Cherokee, Fulton, Cobb, Gwinnett, DeKalb, Henry, Clayton, Fayette, and Douglas. Athens-Clarke is separated from Gwinnett by only one other county, Barrow, which has a population of 56,418. *See* http://quickfacts.census.gov/qfd/states/13/13013.html (accessed May 5, 2006). The twentieth largest county in terms of population in Georgia, Floyd, has a population of 90,565.

21

election of two or more Senators under the *Larios* Plan in 2004.[7] Four of these counties have populations greater than the ideal population for a Senate District in Georgia—that is, 146,187 people.[8] When the ideal number for a single Senate District is 146,187 people, and a county has population in excess of 146,187, we would expect that county to be represented by more than one Senator. Under the *Larios* Plan, there was only one county, out of Georgia's 159, which was (1) outside of the metropolitan Atlanta Area; (2) had a population of less than 146,187; and (3) made up more than one Senate District. However, that county, Houston, covers a very large geographical area. Thus under the provisions of S.B. 386, Athens-Clarke County, with a population of 101,489 people, has become an anomaly among Georgia counties in terms of its representation in the Georgia Senate.[9]

Plaintiffs' second claim—that the Georgia legislature had available a plan that substantially achieved the state's legitimate interests but did so in a manner that was

---

[7]These counties are Chatham, Richmond, Muscogee, Bibb, and Houston.

[8]These counties are Chatham, Richmond, Muscogee, and Bibb, the smallest of the four counties with a population of 153,887 people.

[9]Henry County, with a population of 119,341 (twelfth in population), is divided into three Senate Districts. Forsyth County, with a population of 98,407 (fifteenth in population), is divided into two Senate Districts. However, these counties are not anomalous because they lie within the Atlanta metropolitan area.

22

nearer to one person, one vote—also has some merit. Under the Fair Madison Plan, Senate Districts 46, 47, and 49 deviate from the ideal as follows:

| District Number | Total Population | Deviation | % Deviation |
|---|---|---|---|
| 46 | 145,769 | -418 | -0.29 |
| 47 | 146,268 | 81 | 0.06 |
| 49 | 147,484 | 1,297 | 0.89 |

The absolute overall range between the largest and smallest of the three Senate Districts was 1,715 people. The total deviation from the ideal for the three districts was 1.17%. The Fair Madison Plan, then, would have achieved the state's legitimate goal of placing both Athens-Clarke and Madison within single Senate Districts. Furthermore, the Fair Madison Plan would have accomplished these goals by deviating from one person, one vote by .04 % *more* than the *Larios* Plan so deviated across these three Senate Districts, and by deviating .46% *less* than S.B. 386 now so deviates.

Plaintiffs' third and final claim is that recognized communities of interest have in fact been split up as a result of this bill. This claim too has merit. Defendant asserts S.B. 386 more effectively recognizes and groups together communities than did the *Larios* plan. Specifically, Defendant claims that under the *Larios* plan, District 47 groups the City of Bowman in Elbert County (northeast of Athens), which

23

welcomes growth, with the City of Loganville in Walton County (southeast of Athens, roughly midway between Athens and Atlanta), which opposes growth. Under S.B. 386, Bowman and Loganville are in Districts 47 and 46 respectively. Defendant further claims that S.B. 386 places Oglethorpe County in District 47 with Madison County and the western portion of Elbert County, which all have similar "granite-based" economies. It is undisputed, however, that until the passage of S.B. 386, Athens-Clarke County has never before been placed in two Senate districts. Significantly as well, the split places the University of Georgia—arguably a community of interest in and of itself—in two Senate districts.

The key here, however, as in many other cases, is the allocation of the burden of proof. Again, it is the Plaintiffs' burden to prove that Georgia's Senatorial districting scheme, as set forth in S.B. 386, does not reflect the Georgia General Assembly's "honest and good faith effort to construct districts in both houses of its legislature, as nearly of equal population as practicable." *Reynolds*, 377 U.S. at 577, 84 S. Ct. at 1389-90. In assessing whether Plaintiffs have carried their burden, we must be mindful that neither the State of Georgia nor the Equal Protection Clause invites us, as a general matter, to tinker with "minor departures from some supposed norm." *Davis v. Bandemer*, 478 U.S. 109, 133, 106 S. Ct. 2797, 2811 (1986). As the *Davis* court recognized, redistricting is "a task that should not be monitored too

24

closely unless the express or tacit goal is to effect its removal from legislative halls."
*Id.*

Our review of the record evidence convinces us that Plaintiffs have failed to carry their burden. A simple examination of S.B. 386 and the *Larios* plan reveals the same number of counties are wholly included within a single Senate District under S.B. 386 as was the case under the *Larios* Plan. Under the *Larios* Plan, Madison County was divided, and under S.B. 386, Athens-Clarke County, by far the larger of the two in terms of population, is now divided. Furthermore, the total percentage deviation across all Senate Districts remained unchanged by the passage into law of S.B. 386. We also note that Plaintiffs have not challenged the contiguity or compactness of the new Senate District created under S.B. 386. And we find the new districts are not bizarrely or irregularly shaped.

Ultimately, the Court gives great weight as well to the fact that S.B. 386's total deviation from one person, one vote is, at 1.63%, a percentage that is exceedingly low. We may not invalidate the work of the Georgia legislature in drawing district lines under the one person, one vote principle "when only minor population variations among districts are proved." *Gaffney v. Cummings*, 412 U.S. 735, 751, 93 S. Ct. 2321, 2330 (1973) (reversing a three-judge court's invalidation under the Equal Protection Clause of a districting plan where the maximum deviation between house

25

districts totaled 7.83% and the maximum deviation between Senate Districts totaled 1.81%). Based on the foregoing, we conclude that Plaintiffs have not carried their burden of proving that S.B. 386 is unrelated to any legitimate redistricting criterion. *See Roman*, 377 U.S. at 710, 84 S. Ct. at 1458.

### 3. *Political Motivation*

Plaintiffs also raise the issue of partisanship in arguing that Georgia had no legitimate state interest justifying S.B. 386's departure from the one person, one vote principle. In short, Plaintiffs contend that the interest of Republican legislators in making Athens-Clarke County more competitive for Republican candidates played a role in the ultimate decision to divide Athens-Clarke between two Senate Districts. We do not disagree. Partisan interests, however, lie behind most districting decisions. The Supreme Court recognized as much in *Gaffney*:

> District lines are rarely neutral phenomena. They can well determine what district will be predominantly Democratic or predominantly Republican, or make a close race likely. Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.

412 U.S. at 753, 93 S. Ct. at 2331; *see also Shaw v. Reno*, 509 U.S. 630, 661, 113 S. Ct. 2816, 2835 (1993) (White, J., dissenting) ("Redistricting plans also reflect group interests and inevitably are conceived with partisan aims in mind."); *Henderson v.*

26

*Perry,* 399 F. Supp. 2d 756, 780 (2005) (three-judge court) (Ward, J., concurring) ("I am reminded of the practical observations of one court that politicians are not interested in redistricting 'because of their innate attachment to mathematical exactitude.'" (quoting *Daggett v. Kimmelman,* 811 F.2d 793, 801 (3d Cir. 1987)). As a general matter, we will "not venture[] far or attempt[] the impossible task of extirpating politics from what are the essentially political processes of the sovereign States." *Gaffney,* 412 U.S. at 754, 93 S. Ct. at 2332. One person, one vote claims are fundamentally about offenses against the franchise, not about offenses against political parties. In this case, the presence of partisan considerations in redistricting does not necessarily equate with bad faith on the part of the Georgia General Assembly in passing S.B. 386. Indeed, as Justice Scalia noted in his dissenting opinion in *Larios,* "In the recent decision in *Vieth,* all but one of the Justices agreed [political bias] *is* a traditional [redistricting] criterion, and a constitutional one, so long as it does not go too far." *Larios,* 542 U.S. at 952, 124 S. Ct. at 2809 (Scalia, J., dissenting) (citation omitted).

### 4.   *State Interest as Expressed in the Georgia Constitution*

Plaintiffs contend finally S.B. 386 serves no legitimate state interest insofar as it violates the Georgia Constitution. Article III, section 2, paragraph 2 of the Georgia Constitution provides as follows: "The General Assembly shall apportion the Senate

27

and House districts. Such districts shall be composed of contiguous territory. The apportionment of the Senate and of the House of Representatives shall be changed by the General Assembly as necessary after each United States decennial census." Ga. Const. art. III, § 2, ¶ 2 (amended 1983). Plaintiffs argue in relevant part that such language necessarily limits the time frame ("after each United States decennial census") and frequency with which Defendant may act ("as necessary"). Neither requirement, say Plaintiffs, has been met here. Defendant, not surprisingly, disagrees with Plaintiffs' understanding of Georgia law.

In support of their argument, Plaintiffs rely primarily on the Colorado Supreme Court's decision in *People ex rel. Salazar v. Davidson*, 79 P.3d 1221 (Colo. 2003) (*en banc*). Plaintiffs likely rely on this opinion from another state because the Georgia Supreme Court has not yet had occasion to interpret its own constitution's redistricting provision. In *Salazar*, the Colorado Supreme Court invalidated a congressional redistricting plan passed by the state legislature which had been intended to supplant a court-ordered plan. Specifically, the Colorado Supreme Court held the relevant state constitutional provision limited redistricting to "once-a-decade" only. *Id.* at 1241. While the Court appreciates *Salazar*'s superficial appeal, it finds the decision offers, at best, minimal support for Plaintiffs' argument in the present case.

28

The constitutional redistricting provision at issue in *Salazar* provides as

follows:

"The General Assembly shall divide the state into as many congressional districts as there are representatives in congress apportioned to this state by the congress of the United States for the election of one representative to congress from each district.     When a new apportionment shall be made by congress, the general assembly shall divide the state into congressional districts accordingly."

*Id.* at 1236 (quoting Colo. Const. art. V, § 44). In interpreting this provision to allow

congressional redistricting but once a decade, the Colorado Supreme Court reasoned

in part:

The second sentence of Section 44 places a temporal restriction on redistricting. In the sentence "[w]hen a new apportionment shall be made by Congress, the general assembly shall divide the state into congressional districts accordingly," the word "when" is used as a subordinating conjunction. It indicates the relationship of redistricting and apportionment -- redistricting "shall" take place "when" apportionment occurs. "When," in this context, means "just after the moment that," "at any and every time that," or "on condition that." All of these definitions indicate that in Section 44, the word "when" means that redistricting may only occur after a new apportionment.

*Id.* at 1238 (citation omitted).

By contrast, no similar temporal limitations exist in Article III, section 2,

paragraph 2 of the Georgia Constitution. If anything, the provision more closely

resembles the original Colorado constitutional provision governing state legislative

redistricting, which provides that "'[s]enatorial and representative districts may be

29

altered from time to time, as public convenience may require.'" *Id.* at 1225 (quoting Colo. Const. art. V, § 47). Observing that "Section 44 originally limited the timeframe for congressional redistricting, as it still does, to 'when a new apportionment shall be made by Congress,'" the court in *Salazar* expressly found, "[i]f the framers had intended to allow the General Assembly to draw the congressional districts at will, without temporal limitation, they would have used the 'from time to time' language that they used in Section 47." *Id.* at 1239. While the Court acknowledges "from time to time" is arguably less restrictive than "as necessary," this brings us to the following point: The Supreme Court "repeatedly has held that state courts are the ultimate expositors of state law." *Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S. Ct. 1881, 1886 (1975). Here, neither the Georgia Supreme Court nor the Georgia legislature has yet interpreted the meaning of Article III, section 2, paragraph 2.[10] Additionally, it is worth noting that in upholding the constitutionality of their redistricting plan, the court in *Larios* expressly observed that following the Georgia legislature's inability to adopt a substitute plan, it undertook the "'unwelcome obligation' [of doing so] *pending later legislative action.*" *Larios*, 314 F. Supp. 2d at 1359-60 (quoting *Wise*, 437 U.S. at 540, 98 S. Ct.

------------------------

[10]In *Salazar*, the court noted the state constitution now limits legislative redistricting to once every ten years, citing a statute passed by Colorado's General Assembly in support. 79 P.3d at 1240.

30

at 2497 (1978)) (emphasis added). Given that the language used in Article III, section 2, paragraph 2 is ambiguous, that *Larios* contemplates further redistricting by the state, and that neither the Georgia Supreme Court nor the Georgia legislature has addressed the frequency with which the state may redistrict, the Court finds Plaintiffs' state constitutional argument does little to help them meet their overall burden of showing S.B. 386 serves no legitimate state interest.

In conclusion, based upon the foregoing, this Court finds that S.B. 386 does not violate the one person, one vote principle. We caution, however, that this Order should not be read to invite "new" justifications for intermittent redistricting, based upon the assumption that any such justifications will pass judicial muster so long as the population deviations are within the range of those provided for in *Larios*. Rather, this Court is bound by legal precedent which requires that "the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy." *Reynolds*, 377 U.S. at 579, 84 S. Ct. at 1391. Having concluded Defendant is entitled to prevail on Plaintiffs' one person, one vote claim, we address Plaintiffs' political gerrymandering claim under the Equal Protection Clause.

31

B.    *Equal Protection: Political Gerrymandering*

Plaintiffs do not make a distinct political gerrymandering claim in their complaint; however, as Plaintiffs argue that this case involves unconstitutional political gerrymandering,[11] the Court will briefly discuss the parameters of such a claim.

A political gerrymandering claim under the Equal Protection Clause of the Fourteenth Amendment was the subject of *Davis*, in which Democrats complained of the redrawing of the Indiana state legislative districts by the Republican-controlled legislature. 478 U.S. at 113, 106 S. Ct. at 2800. Three justices in *Davis* expressed the view that such cases raise political issues which simply are not justiciable. *Id.* at 144, 106 S. Ct. at 2816 (O'Connor, J., concurring in the judgment, joined by Burger, C.J., and Rehnquist, J.). A plurality opinion acknowledged the principle that a political gerrymander violates the Constitution where there is a showing of "both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Id.* at 127, 106 S. Ct. at 2808 (White, J., plurality opinion, joined by Brennan, Marshall, and Blackmun, JJ.) (citing *Mobile v.*

------

[11]The Supreme Court has recognized that the term "political gerrymandering" is defined as "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." *Vieth*, 541 U.S. at 271 n.1, 124 S. Ct. at 1773 n.1 (quoting *Black's Law Dictionary* 696 (7th ed. 1999)).

32

*Bolden*, 446 U.S. 55, 67-68, 100 S. Ct. 1490, 1499-1500 (1980)). In a separate opinion, Justice Powell, joined by Justice Stevens, stated agreement with this principle. *Id.* at 161, 106 S. Ct. at 2825 (Powell, J., concurring in part and dissenting in part, joined by Stevens, J.). Beyond that, Justice White's and Justice Powell's opinions diverged to such a degree that there was no majority opinion setting out the substantive elements of a partisan political gerrymandering claim. Justice White's plurality opinion found that discriminatory effect could only be established when "the electoral system is arranged in a manner that will consistently degrade a voter's influence on the political process as a whole." *Id.* at 132 (plurality opinion). Further:

> In a challenge to an individual district, this inquiry focuses on the opportunity of members of the group to participate in party deliberations in the slating and nomination of candidates, their opportunity to register and vote, and hence their chance to directly influence the election returns and to secure the attention of the winning candidate.

*Id.* at 133. "In both statewide and individual districts the question is whether a particular group has been unconstitutionally denied its chance to effectively influence the political process." *Id.* at 132-33. The plurality opinion found the Democrats' claim of vote dilution based on the results of one election insufficient to state a claim and reversed the three-judge court's decision in the Democrats' favor.

33

Justice Powell's opinion, on the other hand, focused on the importance of neutral factors and fairness in the redistricting process, the degree of partisanship in the process, plus such factors as the "shapes of voting districts and adherence to established political subdivision boundaries." *Id.* at 173, 175. Thus, Justice Powell endorsed a flexible approach which did not include requiring proof that the voting power of a minority party would be consistently degraded by the redistricting. Justice Powell found that sufficient evidence had been shown to support the panel's decision to reject the redistricting on equal protection grounds.

Later, in *Vieth*, four justices joined in an opinion endorsing the non-justiciability of these cases. 541 U.S. at 305, 124 S. Ct. at 1792 (Scalia, J., plurality opinion, joined by Rehnquist, C.J., and O'Connor and Thomas, JJ.). *Vieth*, like *Davis*, also involved a Fourteenth Amendment equal protection claim by members of the Democratic Party challenging redistricting by a Republican-controlled legislature. *Id.* at 272, 124 S. Ct. at 1773. Justice Kennedy filed a concurring opinion in which he expressed skepticism as to the justiciability of such claims, though he declined to adopt a categorical rule. He stated:

> [W]e have no basis on which to define clear, manageable, and politically neutral standards for measuring the particular burden a given partisan classification imposes on representational rights.

34

*Id.* at 307-08, 124 S. Ct. at 1793 (Kennedy, J., concurring). Noting that "suitable standards for measuring this burden . . . are critical to our intervention," and finding that such standards had not been articulated by the plaintiffs in *Vieth*, Justice Kennedy also concluded that the complaint should be dismissed for lack of justiciability. *Id.* at 308, 124 S. Ct. at 1793. Therefore, Vieth comes close to establishing that political gerrymandering cases are not justiciable.

In the instant case, the Court cannot ascertain from the materials submitted what manageable or politically-neutral standards might exist in this case that would make a political gerrymandering dispute based on the Equal Protection Clause justiciable. Of course, Plaintiffs had no obligation to address this point, given that they did not make a separate political gerrymandering claim. We now turn to Plaintiffs' claim under the First Amendment.

## C.    *First Amendment: Political Gerrymandering*

In his concurring opinion in *Vieth*, Justice Kennedy expressed a willingness to shift the focus of unconstitutional political gerrymandering claims from the Equal Protection Clause to the First Amendment. *Id.* at 314, 124 S. Ct. at 1797. Citing precedent applying First Amendment principles to invalidate the practice of political patronage and various balloting and primary election restrictions, Justice Kennedy explained that, in the context of political gerrymandering, "First Amendment

35

concerns arise where an apportionment has the purpose and effect of burdening a group of voters' representational rights." *Id.* According to Justice Kennedy, "If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest." *Id.* at 315, 124 S. Ct. at 1797.

Plaintiffs state in their complaint and motion for preliminary injunction that Justice Kennedy's *Vieth* concurrence sets forth the applicable standard for analyzing their First Amendment political gerrymandering claim. (*See* Doc. 1, Pl.'s Compl., at ¶ 88; Doc. 9, Pl's Mem. of Law in Supp. of Their Mot. for Prelim. Inj., at 31-32, 35-36.) They allege Georgia's redistricting plan violates the First Amendment because its purpose and effect is to burden and penalize their "representational rights" based on their political views and affiliation with the Democratic Party. According to Plaintiffs, Georgia's use of political classifications in redrawing the districts burdens their First Amendment "representational rights" by making it more difficult, "if not impossible," for Democratic voters in Athens-Clarke County to elect a Georgia Senator who is a member of their political party. The plan must be struck down, Plaintiffs contend, because this burden is not necessary to achieve a legitimate and compelling state interest.

36

Plaintiffs allege, and we will assume for the sake of our First Amendment political gerrymandering analysis that, based on the 2004 political performance data for the districts in question, splitting predominantly Democratic Athens-Clarke County between districts 46 and 47 will have a deleterious effect on Democratic candidates' already unfavorable chances of success in these districts. In other words, we will assume for the purposes of this discussion that Democratic voters have suffered the injury Plaintiffs claim. The focus of our discussion is therefore whether this asserted injury—i.e., a diminished ability to elect someone from the Democratic Party to the Georgia Senate—is a burden of a First Amendment right. *See Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 1570 (1983) (stating that, when deciding whether a state election law violates the First Amendment, the court must first consider "the character and magnitude of the asserted injury to the rights protected by the First . . . Amendment[]"); *Vieth*, 541 U.S. at 315-16, 124 S. Ct. at 1798 (Kennedy, J., concurring) (citing *Anderson*).  We do not believe it is.

We begin our discussion by explaining why Supreme Court precedent does not support Plaintiffs' First Amendment political gerrymandering claim.  It is beyond dispute that the First Amendment protects political expression and political association. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 15, 96 S. Ct. 612, 632-33 (1976). Nowhere is the First Amendment's protection more urgent and vigorous than in the

37

context of campaigns for political office. *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S. Ct. 621, 625 (1971) ("[I]t can hardly be doubted that the [First Amendment] guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."). Indeed, freedom of political expression and association is the cornerstone of our system of government. *See, e.g., Sweezy v. New Hampshire*, 354 U.S. 234, 250-51, 77 S. Ct. 1203, 1212 (1957) (plurality opinion) ("Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights."); *Elrod v. Burns*, 427 U.S. 347, 356, 96 S. Ct. 2673, 2681 (1976) (plurality opinion) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment."); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574, 120 S. Ct. 2402, 2408 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views."). "'There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments.'" *Elrod*, 427 U.S. at 357, 96 S. Ct. at 2681 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 56-57, 94 S. Ct. 303, 307 (1973)).

Case 1:06-cv-00997-BBM   Document 36   Filed 05/16/06   Page 39 of 46

Plaintiffs make no attempt to relate the burden imposed on their ability to elect the candidate of their choosing to any restriction or limitation on their freedom of political expression. Nor can they; Plaintiffs are every bit as free under the new plan to run for office, express their political views, endorse and campaign for their favorite candidates, vote, or otherwise influence the political process through their expression. Instead, Plaintiffs essentially contend that the First Amendment entitles them to success in those endeavors. We reject that suggestion. "The First Amendment guarantees the right to participate in the political process; it does not guarantee political success." *Badham v. Eu*, 694 F. Supp. 664, 675 (N.D. Cal. 1988) (three-judge court) (rejecting a similar argument under the First Amendment). We agree with the Fourth Circuit's reasoning in *Washington v. Finlay*, 664 F.2d 913, 927-28 (4th Cir. 1981):

> The first amendment's protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and present one's views to the electorate do not also include entitlement to success in those endeavors. The carefully guarded right to expression does not carry with it any right to be listened to, believed or supported in one's views. Where, as here, . . . there is no device in use that directly inhibits participation in the political process, the first amendment . . . offers no protection . . . .

Thus, Plaintiffs have failed to demonstrate how the redistricting plan restricts their freedom of expression.

Nor have they explained how the plan burdens their freedom of association. Citing *Anderson*, 460 U.S. 780, 103 S. Ct. 1564, a ballot access case, they contend the redistricting legislation's impact on their ability to elect the candidate of their choosing affects their right to political association because running for office is an act of political association between the candidate and supporters. (*See* Doc. 9, Pl.'s Mem. in Supp. of Their Mot. for Prelim. Inj., at 35.) Fielding candidates for political office and participating in campaigns are indeed acts of political association (and political expression), and thus receive First Amendment protection. *See Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 224, 109 S. Ct. 1013, 1020-21 (1989) (noting freedom of association includes the freedom "to select a standard bearer who best represents the party's ideologies and preferences" (quotations omitted)); *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 186, 99 S. Ct. 983, 991 (1979) ("[A]n election campaign is a means of disseminating ideas as well as attaining political office. Overbroad restrictions on ballot access jeopardize this form of political expression." (citations omitted)). The Supreme Court's ballot access cases "'focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process.'" *Anderson*, 460 U.S. at 793, 103 S. Ct. at 1572 (quoting *Clements v. Fashing*, 457 U.S. 957, 964, 102 S. Ct. 2836, 2844 (1982)). In *Anderson*, for example, the Supreme

40

Court held Ohio's early deadline for independents to declare their candidacy for President placed an unjustified burden on independent-minded voters' freedom of association and expression. *Id.* at 806, 103 S. Ct. at 1579. Plaintiffs' reliance on ballot access cases presupposes the redistricting legislation restricts or limits their ability to nominate a candidate of their choosing to run for political office. Georgia's redistricting plan, however, has no effect on Plaintiffs' ability to field candidates for office, participate in campaigns, vote for their preferred candidate, or otherwise associate with others for the advancement of common political beliefs. *See Badham*, 694 F. Supp. at 675 (three-judge court) (finding ballot access cases inapposite to a political gerrymandering claim). *Anderson*, like all other ballot-access cases, is therefore inapposite.

Supreme Court precedents invalidating the practice of political patronage in public employment and contracting are likewise unhelpful to Plaintiffs. The paradigmatic case in the political patronage area is *Elrod*, 427 U.S. 347, 96 S. Ct. 2673, in which the Supreme Court held a county sheriff's practice of discharging sheriff's office employees who were not members of his party and did not obtain the sponsorship of one of his party leaders violated the First Amendment. The burdens the practice of political patronage imposes on an individual's First Amendment freedoms of political belief, speech, and association are both obvious and significant:

41

An individual who is a member of the out-party maintains affiliation with his own party at the risk of losing his job. He works for the election of his party's candidates and espouses its policies at the same risk. The financial and campaign assistance that he is induced to provide to another party furthers the advancement of that party's policies to the detriment of his party's views and ultimately his own beliefs, and any assessment of his salary is tantamount to coerced belief. . . . Since the average public employee is hardly in the financial position to support his party and another, or to lend his time to two parties, the individual's ability to act according to his beliefs and to associate with others of his political persuasion is constrained, and support for his party is diminished.

*Id.* at 355-56. 96 S. Ct. at 2681; *see also Bd. of County Comm 'rs v. Umbehr*, 518 U.S. 668, 116 S. Ct. 2342 (1996) (extending the constitutional prohibition on political patronage to government contracting decisions); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S. Ct. 2729 (1990) (extending the rule to hiring and firing decisions). The direct injuries occasioned in political patronage cases are outside the electoral process but impact the electoral process by conditioning employment on political belief and association. The purpose and effect of a political gerrymander, in contrast, is to manipulate the electoral process directly, by altering the composition of electoral districts so a desired election result becomes more likely. In so doing, however, political gerrymandering, reprehensible as it is, does not burden an

individual's freedom of political belief, speech, or association. As we have said, those First Amendment interests remain unimpeded.[12]

Unable to show a deprivation of a recognized First Amendment right, Plaintiffs rely on Justice Kennedy's *Vieth* concurrence and invite us to analyze their political gerrymandering claim under the First Amendment by exploring whether the redistricting legislation burdens "representational rights." 541 U.S. at 315, 124 S. Ct. at 1798 (Kennedy, J., concurring) ("The First Amendment analysis concentrates on whether the legislature burdens the *representational rights* of the complaining party's voters for reasons of ideology, beliefs, or political association." (emphasis added)). Plaintiffs do not define "representational rights," and we cannot find an adequate definition in case law. Thus, in essence, they propose the recognition of a new right

_____

[12]Although Plaintiffs do not specifically so argue, we feel compelled to discuss whether the redistricting has an impermissible "chilling effect" on First Amendment rights. *See, e.g., Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 794, 108 S. Ct. 2667, 2676 (1988) (invalidating a "scheme" that "must necessarily chill speech in direct contravention of the First Amendment dictates"). The only possible chilling effect the redistricting might have on Plaintiffs' speech and association is that Plaintiffs may become discouraged by a lack of political success. We agree with the reasons given by the three-judge court in *Badham* for rejecting such an argument:

> The concept of a "chilling effect" is associated with the doctrine of overbreadth, and describes the situation where persons whose expression is protected are deterred from exercising their rights by the existence of an overly broad statute regulating speech. *See, e.g., New York v. Ferber*, 458 U.S. 747, 768, 772 & n.27, 102 S. Ct. 3348, 3360 & n.27, 73 L. Ed. 2d 1113 (1982). While plaintiffs may be discouraged by their lack of electoral success, they cannot claim that [the redistricting legislation] regulates their speech or subjects them to any criminal or civil penalties for engaging in protected expression.

674 F. Supp. at 675; *see also Pope v. Blue*, 809 F. Supp. 392, 398 (W.D.N.C. 1992) (three-judge court) (following *Badham*).

43

under the First Amendment, one guaranteeing the right to have their views represented in state government by a person of their choosing. Several well-established constitutional principles stand in the way of our recognizing such a right. We have already mentioned the first: the Constitution does not guarantee political success. *See Finlay*, 664 F.2d at 927-28; *Badham*, 694 F. Supp. at 675. Second, our representative form of government does not require that all political parties or groups be accorded representation in government proportionate to their numbers in the electorate. *See, e.g., Vieth*, 541 U.S. at 288-89, 124 S. Ct. at 1782-83 (plurality opinion) (stating the Constitution "nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers"); *Davis*, 478 U.S. at 130-31, 106 S. Ct. at 2809-10 (1986) (plurality opinion) ("Our cases . . . clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be."). Indeed, the notion that the First Amendment guarantees the right to have a one's views represented by a person of his or her choosing conflicts with the traditional practice of "winner-take-all, district-based elections." *Id.* at 130, 106 S. Ct. at 2809. As far as we know, no one has ever challenged the constitutionality of

44

this practice. Lastly, we presume the candidate elected will adequately represent all

of his or her constituents, even those who voted for the opposing candidate. As the

Supreme Court stated in the sufficiently analogous context of equal protection:

> An individual or a group of individuals who votes for a losing candidate
> is usually deemed to be adequately represented by the winning candidate
> and to have as much opportunity to influence that candidate as other
> voters in the district. We cannot presume in such a situation, without
> actual proof to the contrary, that the candidate elected will entirely
> ignore the interests of those voters. This is true even in a safe district
> where the losing group loses election after election. Thus, a group's
> electoral power is not unconstitutionally diminished by the simple fact
> of an apportionment scheme that makes winning elections more
> difficult . . . .

*Id.* at 132, 106 S. Ct. at 2810.

In conclusion, based on our review of First Amendment jurisprudence in the

election context, we find the deleterious effects of political gerrymandering on the

ability of a political party and its voters to elect a member of the party to a seat in the

state legislature implicates no recognized First Amendment right. The party and its

voters remain free to associate with whom they please, field candidates of their

choice, campaign, vote, and express their political views. What Plaintiffs demand is

the right to have their views represented in state government by the representative of

their choice. We decline to recognize such a right under the First Amendment.

45

## IV.  CONCLUSION

Plaintiffs failed to sustain their burden of showing the redistricting plan was unrelated to any legitimate redistricting criterion, failed to articulate manageable or politically-neutral standards that would make an equal protection political gerrymandering claim justiciable, and failed to show the redistricting plan violated rights protected under the First Amendment.


Susan H. Black
United States Circuit Judge


Orinda D. Evans
Chief United States District Judge


Beverly B. Martin
United States District Judge